Deborah SHAW, Administratrix of the Estate of Sidney Bowen, deceased; Nancy Bowen, Individually, and as guardian ad litem for Kimberly Yvonne Bowen and Lee Frederick Bowen, the minor children of Sidney Bowen, Plaintiffs–Appellees,

v.

C.I. STROUD, Individually,
Defendant–Appellant,

and

Alfred E. Morris, J.M. Smith; J.A. McVicker; J.H. Parks, in their individual capacities, Defendants.

Deborah SHAW, Administratrix of the Estate of Sidney Bowen, deceased; Nancy Bowen, Individually, and as guardian ad litem for Kimberly Yvonne Bowen and Lee Frederick Bowen, the minor children of Sidney Bowen, Plaintiffs–Appellants,

v.

Alfred E. MORRIS; C.I. Stroud, J.M. Smith, in their individual capacities, Defendants–Appellees,

and

J.A. McVicker; J.H. Parks, in their individual capacities, Defendants.

Deborah SHAW, Administratrix of the Estate of Sidney Bowen, deceased; Nancy Bowen, Individually, and as guardian ad litem for Kimberly Yvonne Bowen and Lee Frederick Bowen, the minor children of Sidney Bowen, Plaintiffs–Appellants,

v.

C.I. STROUD; Alfred E. Morris; J.M. Smith, in their individual capacities, Defendants–Appellees.

Deborah SHAW, Administratrix of the Estate of Sidney Bowen, deceased; Nancy Bowen, Individually, and as guardian ad litem for Kimberly Yvonne Bowen and

Lee Frederick Bowen, the minor children of Sidney Bowen, Plaintiffs–Appellees,

v.

C.I. STROUD, Individually,
Defendant–Appellant.

Nos. 92–2029, 92–2109, 92–2252 and 92–2253.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 29, 1993.

Decided Jan. 6, 1994.

Rudolph A. Ashton, III, Sumrell, Sugg, Carmichael & Ashton, P.A., New Bern, NC, Samuel Thomas Currin, Raleigh, NC, Linda Anne Fox, Asst. Atty. Gen., North Carolina Dept. of Justice, Raleigh, NC, argued (Denise D. Daggett, Raleigh, NC, Michael F. Easley, Atty. Gen. of North Carolina, Isaac T. Avery, III, Sp. Deputy Atty. Gen., North Carolina Dept. of Justice, Raleigh, NC, on brief), for defendant-appellant.

James Elliot Ferguson, II, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, NC, argued (Anita S. Hodgkiss, on brief), for plaintiffs-appellees.

Before HALL, PHILLIPS, and HAMILTON, Circuit Judges.

## OPINION

HAMILTON, Circuit Judge:

These consolidated appeals and cross-appeals arise out of an action under 42 U.S.C. § 1983 and state law against a North Car-

olina state trooper and several of his supervisors by the wife and minor children of a citizen the trooper shot and killed during an arrest.

## I

On February 27, 1990, Officer Alfred Morris (Morris), a seven-year veteran of the North Carolina Highway Patrol, stopped Sidney Bowen (Bowen), a 42–year–old black man, as he pulled into his driveway, on suspicion of driving while impaired. At Morris' request, Bowen displayed his driver's license and seated himself in the patrol car. When Morris reached for his ticket book, Bowen ran from the car. Morris, flashlight in hand, pursued him.

Meanwhile, Nancy, Bowen's wife, was in her bedroom, and Kimberly, their fifteen-year-old daughter, was in the bathroom. At some point during the chase, both Kimberly and Nancy heard Bowen say, "Okay, Okay, I'll go anywhere you want me to go." (J.A. 117). Morris claims that, when Bowen fell to the ground, Morris caught up with him and took control of him with either an arm-bar technique or by holding him around his collar. Both Kimberly and Nancy heard Bowen yell, "Nancy, I'm going to jail." *Id.* Kimberly and Nancy then ran to the front porch where they saw Bowen and Morris near the patrol car. Bowen was standing with his hands behind his back and Morris was standing behind him. Bowen called to Kimberly, "Kimberly, Kimberly, go get help, tell them the law is trying to kill me in my own front yard." *Id.* Kimberly ran through the house

and out the back door to a nearby uncle's house.

Nancy witnessed from the porch the following entire violent encounter. Morris called the Elizabethtown Office of the Highway Patrol and asked for backup at 9:41:46 p.m. Just as he dropped the microphone, Nancy saw Bowen jerk his hand away from Morris. At this point, Morris became the aggressor and began to hit Bowen with the flashlight about the head and shoulders until he fell to the ground. Nancy claims that Bowen got up and struggled with Morris for control of the flashlight. At that point, she asserts, Morris let go of the flashlight, pulled out his pistol, and fired at Bowen. She stated that Morris was either crouched down or kneeling as he shot Bowen. He fired at least twice; then, Bowen swung at Morris with either his fist or the flashlight. Morris stood up and began backing away from the rear of his car toward the highway as Bowen continued to swing at him. Morris then resumed firing his pistol until Bowen fell to the ground. Morris had fired six bullets, five of which struck Bowen. The injuries were fatal. Morris called for assistance at 9:43:19 p.m.—93 seconds following his initial call prior to the physical confrontation.[1]

Although Morris sustained a two-centimeter laceration on the lower left back of his head, his medical records indicate that he never lost consciousness. The autopsy of Bowen revealed that he had sustained many blunt force injuries to the head and neck. He had extensive bruising on his neck, indicating that pressure had been applied to the front of his neck by some object. He had a blood alcohol content of .11.

---

1. Morris presents a different view of the events. Morris claims that he pushed Bowen's chest up against the right rear passenger door of the patrol car to search him. Bowen allegedly told Morris that he was going to have to call for some help because he (Bowen) would not go along willingly. Deciding to radio for assistance, Morris reached in through the open front passenger door with his right hand (his left hand was holding Bowen) to grab the radio. At 9:41:46 p.m., he called the Elizabethtown Highway Patrol Office and asked for backup. Morris claims that Bowen then swung at Morris with his left hand. A struggle ensued during which Bowen was knocked to the ground. When Morris reached through the passenger door of the car to

retrieve his handcuffs, Bowen took the flashlight from his right hand. When Morris looked up, he says that Bowen had the flashlight poised to hit him. The blow struck the back of Morris' head.

Next, Morris claims that he staggered behind his car, stumbled, and fell to his knees at the edge of the roadway. Bowen allegedly then pounced on him and struck him again with the flashlight. Morris reached for his revolver with his right hand, stuck his middle finger in the trigger guard, flipped off the safety, and then saw Bowen perched to strike him again. He stood, moved away from Bowen, and fired his pistol simultaneously, firing six bullets, five of which struck Bowen.

Sergeant C.I. Stroud (Stroud)[2] was Morris' supervisor from the time Morris joined the patrol in 1983 until late November 1988. Stroud was transferred fifteen months before the Bowen shooting. Nevertheless, during his tenure as Morris' supervisor, Stroud received reports about Morris' use of excessive force. For example, in May 1987, Morris arrested, and allegedly beat, Harvey Paul Walker. Shortly before his trial, Walker saw Stroud at the Waffle House in Whiteville. When he told Stroud that he wanted to talk with him about the way Morris had treated him, Stroud responded, "Oh, what happened, he roughed you up?" (J.A. 354). He suggested that Walker call him. Instead, Walker gave Stroud his phone number and asked him to call. Stroud, however, never called Walker. Thereafter, Walker called the patrol station and left several messages for Stroud; Stroud never returned the calls. Walker did not file a formal complaint.[3]

Again in May 1987, a line sergeant informed Stroud that an arrestee, Thomas Menser, had complained that Morris had called him a "nigger." Stroud asserts that he directed a line sergeant to counsel Morris about this incident. Although Menser also filled out a report of assault, an investigation cleared Morris of the charges.

During an arrest in July 1987, Morris allegedly assaulted Gary Ward. Although Ward never filed a formal complaint against Morris, he told Stroud that he "had been from Maine to Miami and that [he] had never seen anybody with a set of troopers with the conduct and attitude that his officers had." (J.A. 390). Ward claimed that Stroud just "sort of smiled at him." Id.[4]

Responding to allegations of rudeness, a line sergeant counseled Morris about being insulting to the public. These incidents, occurring in September and December of 1987 and in February and May of 1988, were brought to the attention of Stroud.

Morris allegedly assaulted Jessie James during an arrest in March 1988. James testified at his deposition that he saw Stroud when Morris took him to the jail. James claims that Stroud commented to Morris, "You got another one." (J.A. 989). Stroud and Morris allegedly laughed. James asserts that Stroud refused to listen to him when he tried to tell Stroud that Morris had beaten him. James never filed a formal complaint.[5]

In July 1988, Rhonda Cothron called the State Highway Patrol Internal Affairs Department in Raleigh to report that Morris and Trooper C.C. Albritton had assaulted her son. She informed the officer who received the complaint that John Cothron had two five-inch cuts on his head, was beaten in the face, and was struck in the ribs by the troopers. The investigating troopers took Cothron to the hospital. Although Albritton admitted hitting Cothron on the head with his flashlight, Morris declared that Cothron received his injuries when he hit his head on the door molding while trying to avoid being handcuffed. Stroud instructed a subordinate to conduct an investigation in which Morris was completely exonerated.

Morris instituted a disproportionately high number of assault charges against arrestees. From September 1987 to December 1988, during Stroud's tenure, six of the nine charges of assault on a law enforcement officer in Columbus County, North Carolina were brought by Morris. There were forty-six charges for resisting arrest, twenty of

2. Stroud was the District First Sergeant of Troop B–V in Whiteville from February 1981 until late November 1988.

3. In his first affidavit, Stroud points out that Walker denied having ever complained about Morris' conduct. Stroud contends that the conversation at the Waffle House never occurred.

4. Morris and Trooper Thompson were both involved in the arrest of Gary Ward. Stroud claims that Thompson, not Morris, actually hit Ward during the arrest. Stroud also points out that Ward indicates in his affidavit that he complained to Stroud about his treatment by Thompson *and* Morris. Ward did not, Stroud contends, specify that *Morris* had assaulted him.

5. James, Stroud argues, was never able to describe him accurately. Stroud also contends that highway patrol records and the testimony of highway patrol members at the scene confirm that Stroud was not even on duty that night.

which were initiated by Morris.[6] From 1984 to 1990, thirteen people arrested by Morris alleged that he used excessive force.

Sergeant J.M. Smith (Smith) transferred to the B–V Troop and replaced Stroud as First Sergeant in December 1988. When Smith moved to B–V, he knew nothing about Morris. Stroud did not inform him that he had heard any complaints about Morris' use of excessive force.

On May 3, 1989, Judge William C. Gore, then the Chief District Court Judge in Columbus County, spoke with Line Sergeant J.A. White (White) about concerns over Morris' conduct. Judge Gore related that, over the past eighteen months, he had seen case after case involving the use of excessive force by Morris on defendants. He also stated that most of the incidents appeared to "involve blacks or people of lower means." (J.A. 447). Judge Gore remarked that he was afraid that it was "only a matter of time before Trooper Morris seriously injures a person." *Id.* Judge Gore failed to identify any · specific incidents of misconduct. Although Judge Gore told White that he did not wish to file a formal complaint, White filled out a "Record of Complaint and/or Service Request" form regarding his conversation with Judge Gore and left it on Smith's desk since Smith was off duty at the time.

Sergeant White, Morris' line supervisor, talked with Morris about Judge Gore's concerns. White informed Smith that he had counseled Morris. Smith then spoke with his Troop Commander, Captain C.V. Parks (Parks). Smith and Parks decided that the proper course of action would be to monitor Morris' job performance and conduct more closely in the future. As a result, Smith accompanied Morris on patrol on at least two subsequent occasions.

One week after Judge Gore's complaint, Dennis Worley, a local defense attorney, spoke with White about Morris' conduct towards his client, Chris Hardee. Worley felt that Morris had been too rough with Hardee during a drunk driving arrest. After becoming aware of this complaint, Smith assigned White to attend Hardee's trial specifically to hear all the evidence. At the trial, Hardee was found guilty of driving while impaired. No evidence of any improper conduct by Morris was adduced.[7] Smith took no further action on the matter.

In March 1989, Fire Chief Roscoe Jacobs complained to Smith that Morris was rude to him at the scene of an accident. One month later, White advised Morris to be more courteous to the motoring public following an incident involving a tractor on the road.

Three weeks before Bowen was killed, Morris allegedly beat Rudolph Towns in the head with his gun during a drunk driving arrest. Towns suffered a fractured skull.[8] Smith met Morris at the hospital when he took Towns in for treatment. Although Towns contends that he "made it clear" at the hospital that he was upset about his treatment by Morris, Towns never indicates that he made the situation clear to Smith. Towns did not lodge a complaint. Smith did not launch an investigation.

From January 1989 through March 1990, Morris brought two of the six total charges for assault on an officer in Columbus County. He brought eleven of the twenty-seven charges for resisting arrest. Between April 1987 and February 1990, Morris completed Report of Assault forms relating to eight separate incidents in which he claims he was assaulted.[9]

One year after Bowen's fatal shooting, the *administratrix* of Bowen's estate, together with his widow and minor children, filed this § 1983 action against Morris, alleging (1) that he was liable to Bowen's estate for violating Bowen's Fourth Amendment rights by using excessive force to arrest him and (2) that he was liable to Bowen's wife and children for violating their substantive due pro-

---

**6.** Stroud notes that Morris often worked in high risk areas. Many of the arrestees pleaded guilty to assault or resisting arrest.

**7.** Hardee was not allowed to testify regarding Morris' conduct at this trial.

**8.** Morris claims that Towns sustained his injury from hitting his head on a vent shade on the patrol car.

**9.** The staff of Troop B–V included a First ᐧSergeant, two line sergeants, and twenty troopers.

cess "right" to enjoy the "life, love, comfort, and support of their husband and father" without undue state interference. Plaintiffs also asserted § 1983 claims against a number of Morris' supervisors, based on allegations that they had "caused" the constitutional violations alleged by failing to properly train, supervise, and discipline Morris. Only two of the original supervisory defendants are involved in this appeal: Stroud and Smith.[10] Finally, plaintiffs asserted several pendent state-law claims: a wrongful death claim brought against all defendants by Bowen's estate, and claims for negligent and intentional infliction of emotional distress brought against all defendants by Bowen's widow and minor children.

After the close of discovery, Morris, Stroud, and Smith filed separate motions for summary judgment as to all claims along with supporting affidavits and depositions. The plaintiffs responded with affidavits and depositions. When the plaintiffs asserted that Jessie James was afraid of retaliation and would not sign an affidavit, the district court ordered a deposition to be taken. Morris and Stroud moved to strike James' deposition testimony.

As to Morris, the district court granted summary judgment on the Fourteenth Amendment due process claim, the negligent infliction of emotional distress claim, and the intentional infliction of emotional distress claim only as it pertained to Lee Bowen, the minor son of Bowen; however, the district court denied summary judgment on the other claims.

As to Stroud, the district court denied Stroud's motion for summary judgment on the § 1983 supervisory liability claim alleging that he caused the violation of Bowen's Fourth Amendment rights at the hands of Morris. The district court reasoned that Stroud exhibited deliberate indifference because he ignored the complaints of at least three witnesses who alleged that Morris had beaten them during an arrest. Rejecting Stroud's qualified immunity defense, the district court found "no reasonable officer could have believed that Stroud's conduct in tacitly

approving Morris' allegedly unlawful conduct was lawful under clearly established law." (J.A. 139). Holding that a reasonable jury could find the requisite bad faith to support a wrongful death claim against a public officer, the district court also withheld summary judgment on this claim. However, summary judgment was granted on the state law claims of intentional and negligent infliction of emotional distress. The district court also granted summary judgment to Stroud on the § 1983 claim based on Morris' violation of Bowen's Fourteenth Amendment substantive due process rights.

Summary judgment was granted on all claims against Smith. The district court found that Smith exhibited no deliberate indifference to merit liability under § 1983. According to the district court, Smith pursued complaints even though they were not formal. The court held that "at most, Smith's response was negligent, not deliberately indifferent." (J.A. 141). Even if he was deliberately indifferent, the district court opined that Smith was entitled to qualified immunity because his conduct in dealing with Judge Gore's and Worley's informal complaints against Morris was lawful.

Consequently, the district court left the following claims remaining for trial: (1) the Fourth Amendment claim against Morris, (2) the wrongful death claim against Morris, (3) the intentional infliction of emotional distress claim against Morris, (4) the § 1983 claim against Stroud alleging that he caused the violation of Bowen's Fourth Amendment rights through failure to supervise Morris, and (5) the wrongful death claim against Stroud.

Stroud filed an interlocutory appeal from the district court's denial of his motion for summary judgment based on qualified immunity on the § 1983 claim against him, as he was entitled to do under *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). At Stroud's request, we agreed to hear two other issues as part of the same interlocutory appeal, pursuant to 28 U.S.C. § 1292(b): (1) whether the district court

---

**10.** The two other supervisors originally named as defendants—Line Sergeants McVicker and Parks—have been voluntarily dismissed by plaintiffs and are no longer involved in this action.

erred in denying his motion for summary judgment based on the *merits* of the § 1983 claim against him and (2) whether the district court erred in denying his motion to strike the deposition testimony of Jessie James.

Plaintiffs sought leave to cross-appeal, pursuant to 28 U.S.C. § 1292(b), on three additional issues: (1) whether the district court erred in granting Sergeant Smith's motion for summary judgment based on qualified immunity with respect to the § 1983 failure-to-supervise claim against him; (2) whether the district court erred in entering summary judgment against plaintiffs on their state-law claims for negligent infliction of emotional distress; and (3) whether the district court erred in entering summary judgment against plaintiffs on their § 1983 claims for violation of their substantive due process rights. We agreed to hear these issues as well.[11]

We consolidated the appeals and cross-appeals of Stroud and the plaintiffs for briefing and argument.

## II

■ The standard of appellate review for the granting or denial of a summary judgment motion is *de novo.* Thus, the court of appeals uses the same standard as the district court. A moving party is entitled to summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

■ A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party.

*Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.*

## III

■ The principle is firmly entrenched that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates. *See Slakan v. Porter,* 737 F.2d 368 (4th Cir. 1984), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); *Orpiano v. Johnson,* 632 F.2d 1096 (4th Cir.1980), *cert. denied,* 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981); *Withers v. Levine,* 615 F.2d 158 (4th Cir.1980). In *Slakan,* we reasoned that liability is not premised upon *respondeat superior* but upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan,* 737 F.2d at 372–73.

■ Recognizing that supervisory liability can extend "to the highest levels of state government," we have noted that liability ultimately is determined "by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Slakan,* 737 F.2d at 376. *See Spell v. McDaniel,* 591 F.Supp. 1090, 1109–10 (E.D.N.C.1984) (determining issue on supervisory liability is whether defendant proximately caused a violation of the plaintiff's rights by doing some-

---

11. Morris appeals nothing. Neither side appeals the decisions on the intentional infliction of emo-

tional distress claim.

thing or failing to do something he should have done). We have also noted that this issue is ordinarily one of fact, not law. *Id.* *See Avery v. County of Burke,* 660 F.2d 111, 114 (4th Cir.1981).

■ We have set forth three elements necessary to establish supervisory liability under § 1983: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Miltier v. Beorn,* 896 F.2d 848, 854 (4th Cir.1990); *Slakan,* 737 F.2d at 373; *Wellington v. Daniels,* 717 F.2d 932, 936 (4th Cir.1983). *See City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989); *Larez v. City of Los Angeles,* 946 F.2d 630, 645–46 (9th Cir.1991); *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 572 (1st Cir.1991); *Meade v. Grubbs,* 841 F.2d 1512, 1527–28 (10th Cir.1988).

■ To satisfy the requirements of the first element, a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. *Slakan,* 737 F.2d at 373. Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury. *Id.* at 373–74.[12]

■ A plaintiff may establish deliberate indifference by demonstrating a supervisor's "continued inaction in the face of documented widespread abuses." *Id.* at 373. *See Miltier,* 896 F.2d at 848; *Withers,* 615 F.2d at 158;

*Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir.1977). The plaintiff assumes a heavy burden of proof in establishing deliberate indifference because:

> [o]rdinarily, [the plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

*Slakan,* 737 F.2d at 372–73 (quoting *Orpiano,* 632 F.2d at 1101 (citations omitted)). *See Lopez v. Robinson,* 914 F.2d 486 (4th Cir.1990).

■ Causation is established when the plaintiff demonstrates an "affirmative causal link" between the supervisor's inaction and the harm suffered by the plaintiff. *Slakan,* 737 F.2d at 376; *see Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). This concept encompasses cause in fact and proximate cause. In *Slakan,* we noted that the "proof of causation may be direct ... where the policy commands the injury of which the plaintiff complains ... [or] may be supplied by [the] tort principle that holds a person liable for the natural consequences of his actions." *Slakan,* 737 F.2d at 376 (quoting *Wellington,* 717 F.2d at 936).

### A. *Stroud*

■ Stroud argues that the plaintiffs have failed to establish each element required for supervisory liability on his part. Stroud first contends that the plaintiffs have not shown that Stroud knew of conduct by Morris which posed a pervasive and unreasonable risk of harm to citizens like Bowen.

---

12. In practical terms, it should be noted that a showing of a pervasive and unreasonable risk of harm is also necessarily a component of establishing either "deliberate indifference" or "tacit authorization." *See, e.g., Slakan,* 737 F.2d at 372–73.

We disagree. As discussed more fully below, Stroud had knowledge of at least three incidents in which Morris used excessive force which posed an unreasonable risk of harm to arrestees.

■ Next, Stroud argues that he exhibited no deliberate indifference. The plaintiffs, however, have presented more than an isolated incident suggesting Stroud's deliberate indifference to or implicit authorization of Morris' abusive conduct. Three separate witnesses have alleged that, when they notified Stroud of assaults by Morris, he responded callously and with apparent amusement. For instance, Stroud never bothered to return Harvey Paul Walker's phone calls although he knew that Morris had possibly "roughed up" Walker. In addition, Stroud just "sort of smiled" at Gary Ward when Ward reported Morris' violent conduct to Stroud. Besides laughing when Morris escorted Jessie James to the jail, Stroud refused to listen to James when he tried to report that Morris had beaten him.[13] Finally, the statistical evidence speaks for itself: during Stroud's tenure as First Sergeant of Troop B–V (two line sergeants and twenty troopers), Morris instituted twenty-six of the fifty-five charges of assault on a law enforcement officer and resisting/delaying/obstructing an officer. Under these circumstances, Stroud's inaction raises genuine issues of material fact as to whether he "was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." *Id.* at 372–73.[14]

■ The causation prong presents a more difficult question. Stroud contends that, because he transferred fifteen months before the Bowen incident, there is no affirmative causal link to the harm suffered by Bowen. We believe our discussion of causation in *Slakan* forecloses Stroud's argument. In *Slakan*, we determined that the causal link in § 1983 cases is analogous to proximate cause. In other words, Stroud is liable for the "natural consequences of his actions." *Id.* at 376. Notwithstanding the fifteen month gap, Bowen's death was a natural and foreseeable consequence of Stroud's failure to investigate, or even to address, the pervasive violent propensities of one of his officers. Because Stroud was aware of Morris' frequent use of excessive force, it follows that he knew that Morris' unchecked service on the force posed a constant and dangerous threat to the welfare of arrestees.[15] Viewing the evidence in this light, under *Slakan* the plaintiffs have presented sufficient evidence to withstand summary judgment on the element of causation. Succinctly stated, crediting the plaintiff's evidence, a reasonable jury could find that Stroud acted with deliberate indifference and that a causal link exists

13. Stroud attacks the credibility of the affidavits of witnesses who claimed that they notified Stroud after being beaten by Morris. For obvious reasons, this argument is unpersuasive: matters of credibility are for the jury. At the summary judgment stage, the moving party is entitled to "have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts resolved favorable to him." *Miller*, 913 F.2d at 1087.

14. Stroud also argues that no formal complaints were filed, and therefore, no supervisory liability can attach. This argument founders because Major Spainhour's deposition indicates that a complaint need not be written or formal under departmental policy. Therefore, the plaintiffs have proffered sufficient evidence from which a reasonable jury could find that Stroud acted with deliberate indifference to, or tacitly acknowledged, Morris' actions.

15. In *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir.1989), the First Circuit held that the following jury instructions sufficiently described the causation element necessary to establish supervisory liability under § 1983: The acts or omissions of the supervisors must have "played a substantial part in bringing about or actually causing the injury or damage, and that the [in]jury or damage was either a direct result or a reasonable probable consequence of the act or omission." *Id.* at 569. Even though Stroud departed fifteen months before the Bowen incident, his failure to address Morris' problems during Stroud's tenure at least created a jury question as to whether Stroud "played a substantial part" in bringing about Bowen's death.

Interpreting *Rizzo*, the D.C. Circuit has set forth a similar standard for causation under § 1983. In *Haynesworth v. Miller*, 820 F.2d 1245 (D.C.Cir.1987), the D.C. Circuit held, "[w]hen inaction in the face of a substantial threat of harm is shown, it can be said that the supervisor acquiesced in the resulting constitutional violation, thereby 'linking' the nonfeasance with the injury in the manner required by *Rizzo*." *Id.* at 1261.

between Stroud's inaction and the alleged harm. Accordingly, Stroud is not entitled to summary judgment.

### B. *Smith*

■ In their cross-appeal, the plaintiffs contend the district court erred in granting summary judgment to Smith on the Fourth Amendment excessive force claim. We disagree. Despite the plaintiffs' arguments that he should have done more, Smith took supervisory actions on allegations involving Morris' conduct. For instance, when confronted with Judge Gore's complaint, Smith rode with Morris on patrol at least twice. In response to Dennis Worley's complaint, Smith assigned Line Sergeant White to attend Chris Hardee's trial to determine if Morris had engaged in any improper conduct. While Smith did not launch an Internal Affairs investigation into Morris' alleged beating of Rudolph Towns, Towns' affidavit indicates that, although he was upset about the way he had been treated by Morris, he never made this situation entirely clear to Smith. Although Smith's actions may not have been the most effective and although he might have done more, such a rule is not the standard by which we judge Smith's conduct. In short, Smith simply did not exhibit the " 'tacit authorization' of or 'deliberate indifference' to constitutional injuries" required for § 1983 supervisory liability. *Wellington,* 717 F.2d at 936 (quoting *Avery,* 660 F.2d at 114). Because the plaintiffs presented insufficient evidence of this second element of § 1983 supervisory liability, Smith is entitled to summary judgment. .

### IV

■ Both Stroud and Smith argue that, even if the plaintiffs have demonstrated that they exhibited deliberate indifference, qualified immunity serves as a defense. In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court established an "objectively reasonable" standard for qualified immunity. Government officials have qualified immunity for discretionary functions so long as "their conduct does not violate clearly established statutory or constitutional rights of which a rea-

sonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. In determining the availability of qualified immunity, the point of reference is the time at which the action or inaction occurred. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. We have held that officers are entitled to qualified immunity when they rely on standard operating procedures, if that reliance is reasonable. *Vizbaras v. Prieber,* 761 F.2d 1013, 1015 (4th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986). A police officer is entitled to prevail on an assertion of qualified immunity if a reasonable officer possessing the same information would have believed his conduct was lawful. *Slattery v. Rizzo,* 939 F.2d 213, 216 (4th Cir.1991). *See Pritchett v. Alford,* 973 F.2d 307 (4th Cir.1992); *Torchinsky v. Siwinski,* 942 F.2d 257, 260 (4th Cir. 1991); *Korb v. Lehman,* 919 F.2d 243 (4th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 51, 116 L.Ed.2d 28 (1991); *Goodwin v. Metts,* 885 F.2d 157 (4th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990); *Gooden v. Howard Co., Md.,* 917 F.2d 1355 (1990).

### A. *Stroud*

Because of the nature of § 1983 supervisory liability, the plaintiffs must make several separate showings to demonstrate that Stroud lacked qualified immunity: (1) it was "clearly established" at the time of Morris' conduct that Stroud could be held liable under § 1983 for constitutional violations committed by Morris; (2) it was "clearly established" at the time Stroud was supervising Morris that the degree of force that Stroud knew that Morris was using against arrestees was unconstitutional; (3) a reasonable person in Stroud's position would have known that his actions were unlawful.

■ Stroud's argument here is two-fold. First, he submits that the law as to supervisory liability was not clearly established. In the alternative, he argues that the law on excessive force was not clearly established. We disagree.

Before we begin our analysis, it is helpful to summarize concisely the pertinent facts. Stroud was Morris' supervisor from the time

Morris joined the patrol in 1983 until late November 1988, when Stroud was transferred. The majority of the incidents complained of occurred between May 1987 and November 1988. For example, in May 1987, the Walker and Menser incidents took place. In July 1987, Morris allegedly assaulted Ward. In March 1988, James claimed he was assaulted, and in July 1988, the Cothron assault occurred. On February 27, 1990, the Bowen incident occurred.

■ At the time of Stroud's inaction, § 1983 liability for supervisors was clear. In 1984, we held in *Slakan* that a supervisor who was deliberately indifferent in the face of a pervasive and unreasonable risk of harm could be held liable under § 1983 where the inaction bore an affirmative causal link to the harm suffered by the plaintiff. *Slakan*, 737 F.2d at 377. Therefore, it was clearly established at the time of Morris' conduct that Stroud could be held liable for Morris' conduct.

A much closer question concerns whether it was clearly established at the time Stroud was supervising Morris that the degree of force Stroud knew Morris was using was unconstitutional. Throughout the time period in question, it was surely clear that arrestees had a general constitutional right to be free from the use of excessive force by police officers. *See Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). During the time in which the complained of acts and omissions by Stroud took place, this circuit applied a "shock the conscience" test in evaluating claims of excessive force. *Justice v. Dennis*, 834 F.2d 380, 383 (4th Cir.1987), *judgment vacated*, 490 U.S. 1087, 109 S.Ct. 2461, 104 L.Ed.2d 982 (1989).[16] *See also Bailey v. Turner*, 736 F.2d 963, 965 (4th Cir.1984) (framing test as whether use of force "shocks the conscience" or has been applied "maliciously and sadistically for the purpose of causing harm"). In *Justice*, we approved jury instructions which defined the standard for evaluating a claim of excessive force perpetrated by a police offi-

cer as whether the force was so "brutal, demeaning and harmful as literally to shock the conscience of a court." *Id.* at 382. We held that other factors to be considered in an excessive force claim were " 'the need for the application of the force; ... the relationship between the need for the force and the amount of force used; ... [and] the extent of injury inflicted.' " *Id.* at 383 (quoting *Bailey*, 736 F.2d at 970).

Under the "shocks the conscience" test applied in this circuit during the period in question, it is clear that the use of significant amounts of physical force against unarmed arrestees who did not pose a significant risk of harm to the arresting officer or anyone else was unconstitutional. During arrests, Morris engaged in a course of conduct in which he beat severely men who were completely unarmed and who did nothing more than verbally challenge the officer's authority.

In light of the clearly established standard governing supervisory liability, a reasonable person in Stroud's position would unquestionably believe that his conduct violated clearly established law regarding the contours of supervisory liability. Although Stroud claims that he never received the witness' reports of Morris' abuse while he was Morris' supervisor, we must consider the plaintiffs' account as true at the summary judgment stage. Thus, assuming that Stroud did receive the complaints about Morris, Stroud could not have considered his inaction lawful. Stroud's argument is unsuccessful because no reasonable officer possessing Stroud's information would believe his actions—laughing at and ignoring complaints of excessive force perpetrated by an officer he supervised—to be lawful.

### B. *Smith*

■ Even if Smith did arguably exhibit deliberate indifference, he is entitled to qualified immunity. Smith meets the standard for qualified immunity set forth in *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2727: a reason-

16. Although we decided *Justice* under the Fifth Amendment substantive due process clause rather than under the Fourth Amendment, this distinction is without a difference: we were deciding the contours of the circumstances in which a police officer's use of force against an arrestee would violate the Constitution.

able officer, in light of clearly established legal rules, could have believed his conduct was lawful. Smith followed standard operating procedures. He made records of complaints, monitored Morris' actions, and reported Morris' conduct to Smith's superiors. While Stroud maintains that he too followed standard operating procedures, this contention is meritless. Stroud, unlike Smith, failed to investigate any informal complaints. In his deposition, Major Tony Spainhour testified that under State Highway Patrol procedure a complaint need be neither formal nor written to merit investigation.[17] In response to concerns about Morris' use of excessive force, Smith counseled Morris and attempted to ascertain the truth of the allegations and the need for any corrective action. This behavior stands in stark contrast to the callousness exhibited by Stroud when confronted with very similar charges about Morris' actions. Because Smith's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2727, Smith is entitled to qualified immunity.

## V

In their cross-appeal, the plaintiffs contend that the district court erred in dismissing their state law negligent infliction of emotional distress claim against Morris. To establish a negligent infliction of emotional distress claim, the plaintiffs must show that (1) the defendant negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiffs severe emotional distress; and (3) the conduct did cause the plaintiffs severe emotional distress. *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 395 S.E.2d 85, *reh'g denied*, 327 N.C. 644, 399 S.E.2d 133 (1990).

A public officer performing discretionary acts, however, is absolutely immune from mere negligence claims. *Hare v. Butler*, 99 N.C.App. 693, 394 S.E.2d 231 (App.), *disc. rev. denied*, 327 N.C. 634, 399 S.E.2d 121 (1990). A negligent infliction of emotional distress claim, by its very definition, necessarily alleges only negligence. Therefore, Morris is absolutely immune from any negligent infliction of emotional distress claim under North Carolina law.

The plaintiffs argue that gross negligence is sufficient to pierce an officer's immunity. While intentional, malicious, or corrupt actions may pierce an officer's immunity, the North Carolina Supreme Court has never allowed a showing of gross negligence to suffice to pierce an officer's immunity, absent a statute specifically abolishing the common law immunity. *See Wiggins v. City of Monroe*, 73 N.C.App. 44, 326 S.E.2d 39 (1985), *cert. denied*, 320 N.C. 178, 358 S.E.2d 72 (1987). The cases cited by the plaintiffs do not hold otherwise. In *Bullins v. Schmidt*, 322 N.C. 580, 369 S.E.2d 601 (1988), the Supreme Court of North Carolina based its decision on a Motor Vehicle Statute which had specifically displaced common law immunity.[18] In that case, police officers in a high-speed chase caused the deaths of two innocent drivers from a head-on collision. Interpreting the above statute, the Supreme Court of North Carolina translated the standard of care *under that statute* as "gross negligence": if an officer behaves with gross negligence, the court held, the speed limit exemption under the motor vehicle statute did not protect him.

Nor does the case of *Columbus County Auto Auction v. Aycock Auto Company*, 90 N.C.App. 439, 368 S.E.2d 888 (1988), support the plaintiffs' position. In *Columbus*, the North Carolina Court of Appeals did not hold that gross negligence was sufficient to support a claim; it merely stated *in dicta* that not even gross negligence had been alleged to support the plaintiff's claim of negligence in the issuance of North Carolina certificates of title for stolen vehicles. Counseling even

---

17. Even if Stroud could establish that his actions conformed to standard operating procedures, this conduct still fails to meet the requirement in *Vizbaras* that the officer's reliance be reasonable. *Vizbaras*, 761 F.2d at 1013.

18. The relevant statute creates an exemption from legal speed limitations for police officers who are pursuing persons charged with violations of the law. The exemption, however, does not protect police officers who are chasing criminals with a "reckless disregard for the safety of others." N.C.Gen.Stat. § 20–145 (Supp.1987).

more against the plaintiffs' proffered interpretation of North Carolina law is the fact that the case referenced by the North Carolina Court of Appeals in *Aycock Auto Company* holds that public officials are immune from liability for "mere negligence." The Court of Appeals held that a public official does not waive immunity unless it is *alleged* and *proved* that the officer's actions were "corrupt or malicious" or beyond the scope of the official's duties. *Wiggins v. City of Monroe,* 326 S.E.2d at 39. *Accord Harwood v. Johnson,* 92 N.C.App. 306, 374 S.E.2d 401 (App.1988), *aff'd in part, rev'd in part on other grounds,* 326 N.C. 231, 388 S.E.2d 439 (1990), *reh'g denied,* 326 N.C. 488, 392 S.E.2d 90 (1990); *Piggot v. City of Wilmington,* 50 N.C.App. 401, 273 S.E.2d 752 (1981). Because a claim for negligent infliction of emotional distress involves neither of the above elements, Morris' immunity remains intact.

## VI

■ Stroud also alleges that Jessie James' deposition should have been stricken because his testimony conflicts not only with his former statement to Les Burns, a private investigator, but also with the affidavits of three highway patrol officers. In the interview with Burns, James described the night on which Morris arrested and allegedly beat him; however, James failed to allege that Stroud was at the jail that evening. Relying on our decision in *Barwick v. Celotex Corp.,* 736 F.2d 946 (4th Cir.1984), Stroud contends that because James' deposition is inconsistent with his prior testimony and other testimony in the record and intended solely to create an issue of material fact, it should have been stricken. We disagree.

■ We review the lower court's decision not to strike the deposition under the abuse of discretion standard. *Bobb v. Modern Products, Inc.,* 648 F.2d 1051, 1055 (5th Cir. 1981). Unlike the instant case, the *Barwick* case dealt with a party who, after years of litigation, submitted an affidavit solely to contradict prior deposition testimony so as to create a genuine issue of material fact. *Barwick,* 736 F.2d at 960. In contrast, James is not contradicting earlier testimony because

this deposition was his first deposition. Likewise, the *Barwick* deposition was not based on personal knowledge. James' deposition, however, related to a specific personal encounter. In addition, James' deposition did not follow years of protracted litigation. Finally, the credibility of a deposition is a question for the jury rather than an issue to be settled at the summary judgment stage. *See Summerlin v. Edgar,* 809 F.2d 1034, 1039 (4th Cir.1987). Hence, the district court did not abuse its discretion in not striking James' deposition.

## VII

■ Finally, we turn to the plaintiffs' argument that the district court erred in granting summary judgment on their Fourteenth Amendment claim for loss of the love and support of a family member. To this date, we have not recognized such a substantive due process claim for the deceased's family. *See Rucker v. Hartford County,* 946 F.2d 278, 283 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992) ("reserv[ing] for another day" whether we would recognize a due process claim for the deprivation of the love and support of a family member resulting from the unconstitutional action of a state official).

We noted in *Rucker* that other circuits have recognized two different versions of such a substantive due process claim. Under the first version, a plaintiff must show state actions that directly injure the relationship itself, "as by the taking of a child from its parents' custody." *Id.; see Ortiz v. Burgos,* 807 F.2d 6, 7–9 (1st Cir.1986). A plaintiff establishes a violation under the second version by demonstrating "any conduct which, though unrelated to the relationship, violates the constitutional right of any person in the relationship, on the theory that such conduct incidentally injures the relationship, hence the 'liberty interest' in its preservation possessed by all parties to it." 946 F.2d at 282. This is a derivative claim. *See Kelson v. City of Springfield,* 767 F.2d 651 (9th Cir.1985); *Trujillo v. Board of County Comm'r,* 768 F.2d 1186, 1189–90 (10th Cir.1985).

Refusing to "create new substantive rights under the rubric of substantive due process," other courts have refused to recognize a substantive due process claim arising from the deprivation of the love and support of a family member. *Willard v. City of Myrtle Beach, S.C.,* 728 F.Supp. 397, 400 (D.S.C. 1989). *See Harpole v. Arkansas Department of Human Services,* 820 F.2d 923 (8th Cir. 1987); *Dohaish v. Tooley,* 670 F.2d 934 (10th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Interestingly, the United States Supreme Court has never held that the protections of substantive due process extend to claims based on governmental action which affects the family relationship only incidentally. *Ortiz,* 807 F.2d at 8. *See Willard,* 728 F.Supp. at 402.

The plaintiffs argue that the history of and purpose behind § 1983 compels recognition of this claim. We disagree. In *Rucker* we specifically avoided recognizing such a claim. *Id.* at 280. Moreover, because the Supreme Court has never extended the constitutionally protected liberty interest incorporated by the Fourteenth Amendment due process clause to encompass deprivations resulting from governmental actions affecting the family only incidentally, we decline to sanction such a claim at the present time.

Accordingly, the district court properly granted summary judgment in favor of the defendants on the plaintiffs' substantive due process claim.

## VIII

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED.*

K.K. HALL, Circuit Judge, dissenting in part:

A police officer disgraces his public trust by beating anyone who crosses him, especially if that anyone is black and of humble means. Over several years, two different superiors close their eyes to his abuses, and respond with a grin or a sarcastic quip if they happen or are forced to glimpse one. The officer, unrestrained if not downright emboldened by this acquiescence, ends up emptying his gun into a marginally inebriated misdemeanant. So could a jury find on this record.

The most remarkable thing about this sad story is that our law of excessive force, supervisory liability, and qualified immunity has become so labyrinthine (and maybe so overly forgiving) that both supervisors have substantial arguments that they should not be liable for the violation of the dead man's civil rights.

The majority has ably described the legal labyrinth, so I will not belabor it here. After winding through the maze, though, I find myself at a quite different destination. On the § 1983 excessive force claim, I would reverse both the grant of summary judgment for Smith and the denial of summary judgment for Stroud. I therefore respectfully dissent in part. Otherwise, I concur in the judgment and opinion of the majority.

### I.

I think that a reasonable jury could find that Smith was deliberately indifferent. Smith replaced Stroud in December, 1988, and, though Stroud did not share with him any unofficial knowledge of Morris' proclivities, Smith was soon to learn. Judge William C. Gore of the county district court complained to a line sergeant under Smith's command about Morris. Because of his position, Judge Gore intended to offer only discreet advice and did not want to file a formal charge. The line sergeant reported to Smith:

Judge Gore states that he is very concerned that Trp. A.E. Morris is having case after case involving the use of physical force on defendants. Judge Gore states that in his opinion a lot of these cases are a result of excessive force being applied. Judge Gore states that he is being informed from several lawyers that excessive force is being applied to their clients from Trp. Morris. Judge Gore went on to say that he feels that it is only a matter of time before Trp. Morris seriously injures a person and Trp. Morris and the [Highway Patrol] will be sued. Judge Gore states that it seems that most of the

cases he refers to involve blacks or people of lower means. Judge Gore states he likes Trp. Morris but feels bound by his position to inform us of this problem.

This information was soon followed by a complaint by a local lawyer to the same line sergeant. This lawyer reported that his client, Chris Hardee, had been pulled over by Morris in South Carolina, and Morris forced his client at gunpoint to return to North Carolina to be arrested. Back in North Carolina, a scuffle took place between Hardee and Morris, which resulted in Hardee's suffering broken ribs and a broken foot.

Smith discussed the Gore and Hardee information with his commander. Smith decided to ride with Morris on patrol a couple of times to monitor his behavior, and he agreed with the line sergeant that a close eye should be kept on Morris. Finally, he had the line sergeant attend Hardee's trial. When no evidence at the trial indicated any misconduct by Morris—not because it did not exist, but rather because the judge ruled it irrelevant—Smith let the matter drop.

Then, in February, 1990, just three weeks before Bowen was shot, Smith met Morris at a hospital where Morris had taken a drunk driving suspect, Rudolph Towns. Towns had suffered a broken skull during his arrest. Smith did not respond to the incident in any manner.

The district court ruled that, at worst, Smith was only "negligent" in responding to this evidence of Morris' brutality. Invoking qualified immunity, the court stated that a reasonable supervisor could have believed that Smith's response was lawful.

I cannot agree with this ruling. Judge Gore's warning had to be perceived as extraordinary, and should have set off a serious investigation. I don't know how Smith thought that Towns' skull got broken, and I confess puzzlement at the bland dismissal of this episode by both the district court and the majority. True enough, the record does not disclose that Towns made a clearly articulated complaint to Smith. On the other

hand, the majority attaches no fatal significance to this "defect" in its analysis of three incidents that occurred during Stroud's tenure. *See supra* at 799–800 (discussion of Walker, Ward, and James incidents). Though a formal, or at least clearly stated, complaint is a coveted arrow in the civil rights plaintiff's quiver, I know of no decision requiring the plaintiff to prove a supervisor's knowledge of a subordinate's unconstitutional behavior through formal complaints alone. A broken skull speaks for itself. I would hope that arrestees in Columbus County, North Carolina, do not accidentally fracture their skulls on the vent shades of police cars with such frequency that Smith would not be expected to make even a cursory investigation of an individual case.

Judge Gore provided Smith a salutary, and all too prescient, warning; Smith responded in a most ineffective manner. The Hardee complaint received ostrich-like investigation, perhaps from ineptitude, perhaps by design. Towns' fractured skull provided Smith a gratuitous last chance to act; he did nothing. From this series of facts, a jury could reasonably find that Smith's inertia was deliberate.

## II.

I agree with the majority that the numerous affidavits produced by the plaintiffs, along with the later corroboration offered by Judge Gore and the incredibly disproportionate number of arrests Morris made for resisting arrest and assaulting an officer, could easily lead a reasonable trier of fact to find that Stroud simply winked and smiled at Morris' excesses. "Deliberate indifference" would be a charitable description.

But I would reverse nonetheless. Fifteen months passed between Stroud's transfer and the killing of Bowen,[1] and someone else—Smith—had the power, responsibility, and opportunity to put a stop to Morris' misconduct. Under Smith's watch, Towns' skull, Hardee's lawyer, and Judge Gore gave their warnings.

---

1. In its analysis of Stroud's motion on this claim, the district court did not discuss the fifteen-month lapse.

Section 1983 "should be read against the background of tort liability." *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), *overruled in part on other grounds, Monell v. Dep't of Social Services*, 436 U.S. 658, 690–691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Though a person is ordinarily liable "for the natural consequences of his actions," *id.*, neither traditional tort law nor § 1983 imposes liability where causation, though present in fact, is too remote. *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). How remote is "too remote"? Section 1983 does not contain a bright-line "limitations" period on ex-supervisor liability for constitutional violations by erstwhile subordinates, but lapse of time is certainly a prominent consideration. *See, e.g., Martinez*, 444 U.S. at 285, 100 S.Ct. at 559 (five months between parolee's release by defendant and plaintiff's injury at parolee's hands); *Humann v. Wilson*, 696 F.2d 783 (10th Cir.1983) (two-month lapse after parole destroyed proximate cause).[2] In any event, the fifteen-month lapse is not the only factor breaking the links of the causal chain. Even if Smith's responses to the Gore, Hardee, and Towns incidents were merely negligent, his misfeasance was indispensable in bringing about Bowen's eventual death. For all we can know, if Stroud had still been Morris' supervisor, he might have stopped Morris after any of the incidents. A person should be responsible for the natural consequences of his actions, but not necessarily for consequences that can occur only if an independent tortfeasor intervenes.

Proximate cause is a regrettably imprecise concept. In fashioning the quasi-tort federal common law of § 1983, we must define the limits of personal liability in a manner that is both manageable and faithful to the public policy behind the statute. From the best evidence available to me—*Martinez* and its progeny—I conclude that § 1983's "affirma-tive causal link" rapidly deteriorates with passage of time, especially where a new, self-sufficient impetus for the eventual injury develops. In short, though Stroud was probably deliberately indifferent during his tenure, I think that the causal link to Bowen's eventual slaying is too attenuated to fairly support § 1983 liability.

I respectfully dissent.

---

**2.** In *Fox v. Custis,* 712 F.2d 84, 87 (4th Cir.1983), a parolee defrauded an innkeeper within three weeks of release. His parole officers failed to revoke his parole, even though they also suspected that the parolee had committed an arson-murder on the same day as the innkeeper fraud. Two weeks later, the parolee set fire to a house, shot and stabbed one young girl, and raped and set on fire another. We found these injuries "too remote" from the parole officers' actions to support § 1983 liability, citing *Martinez.* We did, however, "bolster" our decision by holding that there is no general constitutional right for a member of the public at large to be protected from "criminals or madmen." *Id.* at 88.