REEVES BROTHERS, INC., Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,
Defendants.

Civil Action No. 94–0053–L.

United States District Court,
W.D. Virginia,
Lynchburg Division.

April 29, 1996.

Timothy Earl Cupp, Cupp & Cupp, Harrisonburg, VA, Thomas N. Griffin, III, I. Faison Hicks, Parker, Poe, Adams & Bernstein, Charlotte, NC, for plaintiff.

John F. Corcoran, U.S. Attorney's Office, Roanoke, VA, Daniel R. Dertke, U.S. Department of Justice, Washington, DC, Andrew S. Goldman, E.P.A., Philadelphia, PA, for defendants.

### MEMORANDUM OPINION

KISER, Chief Judge.

Before me is defendants' motion for summary judgment. The parties have fully briefed the issues involved and I have entertained oral argument. The motion is therefore ripe for disposition. For the reasons contained herein, I am of the opinion that defendants' motion should be granted.

FACTUAL BACKGROUND:[1]

The plaintiff has sued the EPA in addition to six of its employees. The individuals are sued in their official capacities. The individuals include Carol M. Browner, EPA Administrator; Peter H. Kostmayer, Region III Administrator; Karen Melvin, Region III Chief of Enforcement Section; Richard Fetzer, On Scene Coordinator; Robert Guarni, On Scene Coordinator; and Lawrence Richardson, Civil Investigator. For purposes of this motion, these individuals divide into two groups. The first group includes what I will call the Response Team members. This includes defendants Melvin,[2] Fetzer, Guarni, and Richardson. The second group is the management group and includes defendants Kostmayer and Browner.

This lawsuit arises out of an EPA enforcement action. On June 14, 1994 an EPA Emergency Response Team ("the Team") from Philadelphia arrived at property the plaintiff owned in Buena Vista, Virginia. The property is located in EPA's "Region III" administrative area. The plaintiff had purchased the property from John Mace, now 87 years old, in February 1994; the sale was reported and described in unmistakable terms in the local paper. Mace leases a dwelling on property that he sold to plaintiff.

The property in question is surrounded by a fence. Road entry to the property is through a locked gate. The fence is posted with "No Trespassing" signs. In the late 1970s and through the early 1980s the property was used for the secure placement of rubber compound materials. It continues to hold those materials to the present time. There has been no release of contaminants from this property throughout the time in question. The interior portion of the property where the rubber compounds were placed, which is approximately one half-mile inside the first fence described above, is surrounded by another fence. That fence was also locked.

Mace had a key to the outside fence so that he could enter and remove equipment stored on the site. When the Team arrived in three van-loads of people, Mace went outside to determine what was happening. After determining Mace had a key to the outer gate, the Team asked for it, stating that they wanted to enter the property to look for hazardous substances. It is disputed whether Mace told the Team that he did not own the property. In any event Reeves had not given consent for EPA to enter, nor had the Team contacted Reeves to obtain such consent, even though the EPA had planned the Team's visit at least five days previously.

Mace gave the Team members the key to the outer gate, although plaintiff had never authorized him to provide the key to anyone. The Team proceeded through the first gate and drove the half-mile to the locked inner gate. They climbed over the locked inner gate and fence and proceeded to collect soil and water samples, run other tests, and to make a visual inspection of the property.

During the search of plaintiff's property, defendant Richardson phoned James Hall, an employee of the plaintiff. Richardson met with Hall away from the property. He questioned Hall about where the rubber compounds had been stored. Richardson did not inform Hall that the Team members were

---

1. The factual recitation is taken almost entirely from my order entered April 11, 1995. Several additions have been made to reflect discovery subsequent to that date. Since defendants are the movant both now and previously, the factual posture has not changed.

2. Defendant Melvin was apparently not physically present on defendant's property. She is, however, directly involved in the supervision of the other Response Team members.

presently on the property conducting tests and collecting samples. Richardson told Hall that EPA's action with respect to the plaintiff's property was a routine follow-up of an earlier EPA inspection of another area company. Richardson returned to the property after his conversation with Hall and continued the Team's actions. After talking with Richardson, Hall went to the property and met the Team as it was leaving. He was not given a receipt for the water and soil samples nor was he ever served with a warrant, order, or other authorization permitting the Team's entry onto the property.

The plaintiff alleges that the defendants acted pursuant to a *de facto* policy in EPA Region III in conducting the warrantless search. Plaintiff recounts its difficulties in dealing with the EPA after the search and its inability to get the Response Team defendants to acknowledge that something wrong occurred. Defendant Melvin, the supervisor of the other defendants who constituted the Team, told plaintiff that it was the usual practice for the EPA not to obtain consent or a warrant and instead to gain immediate access to property so as to inspect it for contamination. Melvin stated further that the samples taken were merely preliminary and that it was the EPA's intention to return to the property, regardless of the outcome of the sample tests.

Dennis Carney, EPA Region III chief and Melvin's supervisor, has since stated that EPA does not conduct warrantless searches and that there is no policy in Region III directing such illegal searches. Carney also says that EPA does not intend to return to the property but that if it did, it would first obtain either a warrant or an administrative order. The improperly seized samples and test results have since been destroyed. No charge for any environmental violation has been filed against Reeves.

By an order entered April 11, 1995 all claims were dismissed, with the exception of the claim for a Fourth Amendment constitutional violation, which survives both against the EPA and the individual defendants in their official capacities. This claim, seeking injunctive relief, is the subject of defendants' instant motion for summary judgment.

DISCUSSION:

### I. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.) (citations omitted), *cert. denied,* 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### II. Fourth Amendment Injunctive Relief

Plaintiff must satisfy a three-pronged analysis in order to enjoy injunctive relief: plaintiff must have (1) suffered an injury in fact, which is (2) casually connected to governmental action, and (3) there must be *genuine indication that the plaintiff will suffer future harm* at the hands of the government. *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).[3] It is the final prong with which plaintiff has difficulty.

Despite lengthy discovery, and the considerable resources available to plaintiff's counsel, no evidence has been produced indicating that it is indeed a policy of the EPA to

---

**3.** Defendants frame the *Lyons* analysis as a jurisdictional question and argue that because the third prong is unsatisfied this court is divested of jurisdiction to award injunctive relief. I disagree. This court enjoys jurisdiction because there a case in controversy. Restrictions on the appropriate form of remedy are not jurisdictional.

conduct warrantless searches. No evidence from similarly situated parties or other incidents has been introduced, either—most importantly—from within Region III or even from around the nation. Plaintiff relies upon the single incident occurring on June 14, 1994 and the ominous statements by Melvin indicating EPA's intention to return. Melvin's statements are countered by those of Carney, expressing EPA's intention to henceforth conduct itself properly.

A single incident does not establish a pattern or policy; there must be a realistic, cognizable danger of future harm. One incident is insufficient to establish this requisite danger. *S–1 v. Spangler,* 832 F.2d 294, 297–98 (4th Cir.1987). I cannot conclude from the record that EPA's actions were anything but aberrant and that in future EPA will conduct itself lawfully, should it desire to again search plaintiff's property.

Plaintiff is therefore not entitled to injunctive relief. Having so ruled, however, I add that should EPA fail to obtain a proper warrant for any future searches of plaintiff's property, I or any other court should be hard-pressed to find that EPA does not in fact pursue a policy of illegal searches.

The search plaintiff suffered at the hands of the EPA was indisputably in violation of the Fourth Amendment. Stripped of the apologetic confections with which the government seeks to embellish it, the search proceeded thus: the Team of zealous investigators, unsure even of the location of the suspect property, located the property and obtained permission to enter from a man unauthorized to give it,[4] and then scaled the second gate to gain entry to the area they sought.

Melvin and Carney's conflicting statements cancel one another for the purpose of the legal analysis here, but Melvin's statements leave the palpable impression that there are those within EPA, and in Region III specifically, who believe the Fourth Amendment to be inapplicable to the realm of environmental investigation. They are sadly mistaken.

This case boils down to a single badly misinformed team that rode roughshod over the Fourth Amendment. Should it recur, however, a strong case would be made for estopping the government's denial that the rogues are not in truth the regulars.

---

4. I reject absolutely EPA's assertion that Mace had apparent authority to grant entry. The sale of Mace's property to plaintiff was both recorded and noticed in a public newspaper. If the public is expected to be apprised of every environmental regulation appearing in the United States code and registers, EPA should certainly be aware of publicly-noticed changes in title affecting the properties they subject to search.