**Debbie Jo RAITH**

v.

**JOHNS HOPKINS UNIVERSITY, et al.**

No. CCB–99–910.

United States District Court, D. Maryland.

June 22, 2000.

Paul F. Evelius, Esq., Wright Constable & Skeen, LLP, Baltimore, MD, for Plaintiff.

Susan Martielli, Esq., Frederick G. Savage, Esq., The Johns Hopkins University, Office of the Vice President & General Counsel, Baltimore, MD, for Defendants.

## *MEMORANDUM*

BLAKE, District Judge.

Now pending before this Court is a motion by Defendants Johns Hopkins University ("Hopkins" or "the University") and Peter O. Kwiterovich, Jr., for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Debbie Jo Raith brought this action alleging that the Defendants terminated her employment in violation of the Family and

Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"). After the completion of discovery on the issue of liability, Defendants moved for summary judgment. This matter has been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, the Court will deny the Defendant's motion.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that:

> [Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994). In making this determination, the evidence of the party opposing summary judgment is to be believed and all justifiable inferences drawn in her favor. *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 196 (4th Cir.1997) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). The non-moving party may not rest upon mere allegations or denials in her pleading, however, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Allstate Fin. Corp. v. Financorp, Inc.,* 934 F.2d 55, 58 (4th Cir.1991). The "mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough to defeat a defendant's summary judgment motion. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## BACKGROUND

Defendant Kwiterovich specializes at Hopkins in lipid and lipoprotein disorders. (Dep. of Peter O. Kwiterovich, Jr., Defs. Summ. J. Mot., Ex. A ["Kwiterovich Dep."], pp. 6 & 8) Kwiterovich is the Director of the Lipid Research Atherosclerosis Division ("LRAD"), part of Hopkins' Department of Pediatrics in the School of Medicine. (Aff. of Debbie Jo Raith, Pl. Opp'n, Ex. A ["Raith Aff."], ¶ 4) Kwiterovich's research affects those people who have either very high or very low levels of fats in their blood and, as a result, may suffer from various diseases. (Kwiterovich Dep., pp. 6 & 8) As the Principal Investigator ("PI"), Kwiterovich is financially responsible for the salaries and other expenses of the LRAD. (Aff. of Peter O. Kwiterovich, Jr., Defs. Summ. J. Mot., Ex. G ["Kwiterovich Aff."])

The LRAD includes the University Lipid Clinic (the "Clinic"). (Kwiterovich Dep., p. 16; Raith Aff., ¶ 4) The Clinic receives drug protocols from pharmaceutical companies, recruits participants for a study of the drug, and then conducts the study. (Raith Aff., ¶¶ 7–9) On Monday, Tuesday, and Wednesday of each week, the Clinic focuses on conducting drug studies. (*Id.* at ¶ 6; Kwiterovich Dep., p. 35) On Thursdays and Fridays, the Clinic sees private patients who pay for the services. (Raith Aff., ¶ 6; Kwiterovich Dep., pp. 16 & 35)

In September 1993, the Clinic hired Raith as Assistant Research Coordinator. (Raith Aff., ¶ 10) Plaintiff's duties consisted of drawing blood and taking vital signs from drug study participants and private patients, preparing patients' charts, assisting with recruitment of drug study participants, filing paperwork, and preparing specimens for shipment. (*Id.*) As an Assistant Research Coordinator, Plaintiff received "above expectation" and "outstanding" job evaluations. (Pl.Opp'n, Ex. 5)

Around October 1996, Plaintiff replaced Lorraine Donovan and assumed the Clinic position of Drug Study Coordinator. (Raith Aff., ¶ 11) In early 1997, Plaintiff's formal title became Drug Study Coordinator. (*Id.*) Her duties included patient recruitment, patient evaluation and follow-up, protocol management, interacting with pharmaceutical companies, maintenance and dispensing of drugs, data entry, budgetary management, and various other responsibilities. (Pl.Opp'n, Ex. 6) Job evaluations reflected that Raith's performance was "outstanding." (Pl.Opp'n, Ex. 5) Kwiterovich has testified that Raith was his "right hand person" for the pharmaceutical drug studies. (Kwiterovich Dep., p. 45)

By the summer of 1998, the LRAD was having financial difficulties. (*Id.* at pp. 39–40) The number of drug studies had decreased and Kwiterovich had to raise money from his private patients to help pay the salaries of faculty members in the research portion of the LRAD. (*Id.* at p. 36; Dep. of Debbie Jo Raith, Defs. Summ. J. Mot., Ex. B ["Raith Dep."], p. 149) The number of people employed by the LRAD was also reduced. The LRAD employed approximately forty people in 1996. (*Id.* at p. 40). By the summer of 1998, that number had dropped to twelve. (*Id.*) As of September 1998, the Clinic itself employed five people, including Raith and Kwiterovich. (Raith Aff., ¶ 15)

Concerned about the LRAD's financial situation, Raith approached Kwiterovich asking about the stability of her position. (*Id.* at ¶ 13; Kwiterovich Dep., p. 39) According to Raith, Kwiterovich assured her

that the research area of the LRAD was in trouble but that the Clinic itself was not in danger. (Raith Aff., ¶ 13) Kwiterovich recalls telling Raith that, to the best that he could determine, her position was secure. (Kwiterovich Dep., p. 40) Kwiterovich has testified, however, that the entire Division was in trouble, including the Clinic. (*Id.*)

Also in the summer of 1998, Plaintiff began having difficulties with her elbows. (Raith Aff., ¶ 16) She informed Kwiterovich that she needed surgery for her elbows and, as a result, needed to take leave from work. (*Id.*) Kwiterovich responded, in a raised voice, that her timing could not have been worse since critical new drug studies were about to begin. (*Id.* at ¶ 17; Kwiterovich Dep., p. 43)[1] Despite these hesitancies, Kwiterovich told Raith to fill out the necessary forms and he would grant the leave. (Raith Dep., pp. 103–04)

Beginning October 12, 1998, Plaintiff took FMLA leave for her surgeries. (Raith Aff., ¶ 19) Before Raith left, Kwiterovich asked her if she would be willing to help with some of the recruiting duties while she was out on leave. (Dep. of Peter O. Kwiterovich, Jr., Pl. Opp'n, Ex. 2 ["Kwiterovich Dep., Pl. Opp'n"], p. 47) Raith refused explaining that her arm was going to be in a cast after the operation. (*Id.* at p. 48) Kwiterovich testified that he did not understand this response since he believed that Raith could make phone calls even with the cast. (*Id.* at pp. 48–49)

After the operation was over, Kwiterovich again asked Raith to do some work for the Clinic. (*Id.* at p. 49) According to Kwiterovich, "given the dire circumstances

---

1. Plaintiff contends that Kwiterovich has reacted negatively to other employees who had physical injuries. According to Plaintiff, another Clinic employee, Sandra Baughman, injured herself in a car accident and was told by her doctor that she should not type. (Raith Aff., ¶ 18) Plaintiff contends that she overheard Kwiterovich tell Baughman that

Baughman should continue her typing duties, regardless of the doctor's advice. (*Id.*) Baughman, however, denies that Kwiterovich ever expressed hostility toward her use of FMLA leave. (Dep. of Sandra Jean Baughman, Defs. Summ. J. Mot., Ex. E ["Baughman Dep."], pp. 8–10)

of our team in the Lipid Clinic, [I thought] that that was a reasonable request." (*Id.*) While on leave, Raith did give some assistance to the Clinic, but did not call to help with patient recruiting. (*Id.* at pp. 49–50) Kwiterovich admitted that Raith's failure to assist in the recruiting disappointed him, especially since it forced his staff to work extra hours. (*Id.* at p. 50)

According to Raith, Loretta Wankel, an administrative manager in Hopkins' Lipid Research Division, also expressed hostility toward Plaintiff's leave. After Raith's first surgery in October, Wankel periodically called Raith to see how she was feeling. (Raith Aff., ¶ 20) During a telephone conversation in mid-November, Raith explained to Wankel that the second surgery was scheduled for November 30, 1998. Wankel allegedly "snapped, 'you mean you're not coming back [to work] in between [surgeries].'" (*Id.*) After Raith explained that she would not be returning, Wankel stopped calling to inquire about Raith's health. (*Id.*)

In November 1998, Dr. Nancy Yokois, a pediatric gastroenterologist with a full-time faculty appointment at Kennedy Krieger Institute ("Kennedy Krieger"), approached Kwiterovich and asked him if she could increase her time commitment in the Clinic. (Dep. of Nancy Yokois, Defs. Summ. J. Mot., Ex. D ["Yokois Dep."], pp. 6 & 12) Prior to November, Yokois was spending five percent of her time at the Clinic and the rest of her time at Kennedy Krieger. (*Id.* at p. 9) Yokois said that she approached Kwiterovich because she wanted to become more involved in research. (*Id.*)

Kwiterovich testified that he viewed Yokois' request as a unique opportunity for the Clinic. (Kwiterovich Dep., p. 79) As a physician, Yokois could perform a variety of functions, including patient visitation. (*Id.* at pp. 79–80) By increasing Yokois' time at the Clinic, Kwiterovich would have more time to spend at the research laboratory. (*Id.* at p. 80) Kwiterovich believed that by spending more time in research he could increase the research funding for LRAD. (Dep. of Loretta Ann Wankel, Defs. Summ. J. Mot., Ex. C ["Wankel Dep."], p. 18).

Kwiterovich spoke to Wankel and asked Wankel to financially analyze Yokois' request. (*Id.* at p. 18) Wankel explained to Kwiterovich that, in order to increase Yokois' time at the Clinic, Kwiterovich would have to terminate another employee. (*Id.* at p. 19)[2] Kwiterovich told Wankel that he would have to terminate Raith. (*Id.* at p. 17) Kwiterovich explained that, unlike the other employees, Raith's duties could be performed by the remaining people. (*Id.*)

On December 15, 1998, while Raith was out on leave, Defendants sent her a letter stating that, for funding reasons, her position was being abolished as of January 18, 1999. (Pl.Opp'n, Ex. 8)[3] Upon receiving this letter, Raith contacted Marcy Halversen in Hopkins' Human Resources Department. (Raith Aff., ¶ 21) Halversen allegedly responded: "Well, you know, that happens a lot when people go out on disability." (*Id.*)

At the time of her termination, Raith's annual salary was $26,788. (*Id.* at ¶ 11) Yokois' salary, on the other hand, was $90,000. (Pl.Opp'n, Ex. 14) The Clinic worked out a deal with Kennedy Krieger whereby Yokois would spend approximately half of her time at the Clinic and the Clinic would pay half of Yokois' salary. (*Id.;* Kwiterovich Dep., p. 80) Kwiterovich

---

**2.** Wankel testified that even before Yokois approached Kwiterovich, Kwiterovich was told that he needed to start thinking about letting another employee go. (Wankel Dep., p. 15)

**3.** Raith did return to work on January 4, 1999, and worked until January 15. (Raith Aff., ¶¶ 22–23)

estimated that the difference between the amount paid to Raith and that paid to Yokois could be recovered through a new pharmaceutical grant that LRAD had recently received. (Pl.Opp'n, Ex. 14)

In addition to Yokois, other employees have assumed some of the duties of Raith's former position. Ellen Gold began working more hours while Raith was out on leave and, after Raith was terminated, Hopkins began paying Gold for six extra hours of work per week. (Kwiterovich Dep., Pl. Opp'n, pp. 118–19) The Clinic also had to retain the outside services of a technician to perform certain duties, such as blood drawing, that Raith had previously accomplished. (*Id.* at pp. 123–25)

On April 1, 1999, Raith filed a complaint in this Court alleging that the Defendants terminated her employment in violation of the FMLA. After the completion of discovery on the issue of liability, Defendants moved for summary judgment.

*ANALYSIS*

In retaliation causes of action under the FMLA, courts have applied the *McDonnell Douglas* burden shifting analysis applicable to Title VII retaliation claims. *See Knussman v. Maryland,* 16 F.Supp.2d 601, 613 (D.Md.1998); *Cf. Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir.1998) (finding the burden shifting analysis useful, but not needing to apply it since the case had proceeded to a jury verdict).[4] The Supreme Court has recently clarified this proof structure. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). First, the plaintiff must establish a prima facie case of dis-

crimination. *See id.* at 141, 120 S.Ct. 2097. If the plaintiff can establish her prima facie case, the burden shifts to the defendant to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The defendant's burden is one of production, not persuasion, and the court should not evaluate the credibility of the defendant's explanation. *See Reeves,* 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105. Once the defendant satisfies its burden, "the *McDonnell Douglas* framework—with its presumptions and burdens—[disappears] and the sole remaining issue [is] discrimination vel non." *Id.* (internal quotations omitted).

Although discrimination vel non remains the ultimate issue, the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). "[T]he plaintiff may attempt to establish that [s]he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'" *Reeves,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089). The plaintiff can use evidence establishing her prima facie case, and inferences properly drawn therefrom, to support a showing that the defendant's proffered reason is not believ-

4. The Court agrees with *Knussman* and the dicta in *Cline* that the application of the *McDonnell Douglas* burden shifting approach to FMLA claims is both appropriate and helpful. The Court therefore disagrees with *Tyson v. MCI Telecomm. Corp.,* 1998 WL 1033581, at *11–15 (N.D.Ga.1998), relied on by the Plaintiff. The Court notes that the Seventh Circuit, also relied on by the Plaintiff, has since analyzed FMLA retaliation cases under the *McDonnell Douglas* framework. *See King v. Preferred Technical Group,* 166 F.3d 887, 891–94 (7th Cir.1999).

able. *See Reeves,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105.

There may be circumstances where the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, and yet no rational juror could conclude that the defendant's action was discriminatory. *See id.* at 147, 120 S.Ct. 2097. But, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* Therefore, by establishing a prima facie case and putting forth sufficient evidence to refute the employer's explanation for its decision, the plaintiff may be able to sustain her burden of proving intentional discrimination. *See id.*

■ Applying this framework to the facts of this case, Raith has made a sufficient showing of discrimination to avoid summary judgment. To establish a prima facie case of discriminatory retaliation under the FMLA, Raith must prove that she engaged in a protected activity, that she suffered an adverse employment action, and that the two were causally related. *See Knussman,* 16 F.Supp.2d at 613. Defendants do not dispute that Raith engaged in a protected activity or that she suffered an adverse employment action. *See* Defs. Summ. J. Mot., p. 10. Although Defendants maintain that Plaintiff has not provided any evidence to support a causal connection between these two elements, the Court disagrees. Plaintiff was fired while out on FMLA leave despite being previously told that her position was not in danger. Courts have held that such temporal proximity is itself sufficient to satisfy the causal connection requirement. *See Gleklen v. Democratic Congressional Campaign Comm., Inc.,* 199 F.3d 1365, 1368 (D.C.Cir.2000); *King,* 166 F.3d at 893. Moreover, both Kwiterovich and Wankel, the two individuals involved in the decision to terminate Raith, allegedly expressed hostility toward Raith's use of FMLA leave. These facts are sufficient to establish a causal connection between Raith's use of FMLA leave and her termination while out on leave.

■ In response to Plaintiff's prima facie case, the Defendants claim that Raith was fired because of budgetary constraints resulting, in part, from Kwiterovich's decision to increase Yokois' time at the Clinic. Since the Defendants have offered a legitimate reason for their actions, Raith retains the burden of proving that she was the victim of intentional discrimination. In satisfying this burden, however, she can attempt to show that the Defendants' asserted reasons are unworthy of belief.

To cast doubt on the Defendants' rationale, Raith can rely on the facts supporting her prima facie case. As explained above, Raith was fired while out on FMLA leave despite being previously told that her position was not in danger. The Defendants maintain that this timing was merely coincidental; Yokois happened to approach Kwiterovich about increasing her time at the Clinic while Raith was on FMLA leave. Wankel testified, however, that Yokois "had always wanted to come back and [Kwiterovich] always needed a doctor, they just never had the funds. So I think this kind of clicked later on ...." Wankel Dep., p. 16. A reasonable juror could interpret this testimony as indicating that Yokois had wanted to increase her time at the Clinic prior to Raith's absence, but the decision was not made until Raith took FMLA leave.

The increase in personnel expenses after Raith's termination also casts doubt on the Defendants' proffered explanation. Wankel testified that even before Yokois approached Kwiterovich, Kwiterovich was told that he needed to start thinking about letting another employee go. Wankel's testimony suggests that, for financial reasons, the Clinic was considering terminating Raith prior to Yokois' request.

After Kwiterovich increased Yokois' hours and terminated Raith's position, however, the Clinic's personnel expenses actually increased. The portion of Yokois' salary paid by the Clinic was significantly greater than Raith's salary. Further, as a result of the elimination of Raith's position, the Clinic had to pay Ellen Gold to work additional hours and had to retain the outside services of a technician. Given this evidence, a reasonable juror could discredit Wankel's testimony that financial constraints prompted the elimination of Raith's position.

Moreover, Kwiterovich never explicitly stated that he would have decided to terminate Raith and increase Yokois' hours had Raith not taken leave. Instead, Kwiterovich testified that he "may have" terminated Raith, and would have given "serious consideration" to terminating Raith, had she not exercised her FMLA rights. Kwiterovich Dep., p. 45.[5] Given the alleged hostility expressed by both Kwiterovich and Wankel toward Raith's use of FMLA leave, and their apparent frustration over Raith's failure to work while on leave, a reasonable juror could conclude that Raith's absence was the determinative factor in the Defendants' decision to terminate her position.

Finally, Raith testified that Marcy Halversen in Hopkins' Human Resources Department told her that people often lose their positions when they go out on disability leave. Such a statement, if believed by the jury, would lend support to Raith's claim. Given this statement, the strength of Raith's prima facie case, and the fact that a reasonable juror could find the Defendants' asserted rationale unworthy of belief, the Court finds that Raith has raised a triable issue on whether she was terminated for exercising her FMLA leave. Accordingly, the Court will deny summary judgment.[6]

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. Defendants' motion for summary judgment is **denied**; and

2. Copies of this Order and the accompanying Memorandum shall be mailed to counsel of record.

---

5. After considering the entire dialogue on this topic, reasonable jurors could differ in their interpretation of Dr. Kwiterovich's deposition testimony on this issue. *See* Kwiterovich Dep., pp. 45–46.

6. Since the parties have not completed discovery on the issue of damages, the Court rejects the Defendant's argument that summary judgment is appropriate because Raith has not suffered any harm.