Phillip Edward **BELL**, Plaintiff,

v.

E. DAVIS INTERNATIONAL, INC., and Car–Freshner Corporation, Defendants.

No. Civ 1:00CV131–C.

United States District Court, W.D. North Carolina, Asheville Division.

April 4, 2002.

W. Perry Fisher, II, Van Winkle, Buck, Wall, Starnes & Davis, P.A., Asheville, NC, James H. Kelly, Jr., Susan H. Boyles, Kilpatrick Stockton LLP, Winston-Salem, NC, Jonathan Hudis, Roberta Sue Bren, Oblon, Spivak, McClelland, Maier & Neustadt, P.C., Arlington, VA, for E. Davis Intern., Inc., Car-Freshner Corp.

James H. Kelly, Jr., Susan H. Boyles, Kilpatrick Stockton LLP, Winston-Salem, NC, Steven D. Cogburn, Cogburn, Goosmann, Brazil & Rose, P.A., Asheville, NC, for Cousin Corp. of America.

## AMENDED MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on Defendants' motion for summary judgment. Because the Court will grant the motion for summary judgment, the remaining motions, *i.e.*, Defendants' motion for a protective order; Plaintiff's motion to compel, motion for reconsideration of the Court's Order of January 17, 2002, for withdrawal of the Cogburn law firm, and motions to continue the case from the March 2002 term will be denied as moot. Several of Plaintiff's filings with the Court are construed to contain motions to amend the complaint to add Cousin Corporation of America, Inc., formerly a third-party defendant, as a party defendant to Plaintiff's claims. These motions as well will be denied as moot.

## I. PROCEDURAL HISTORY

On June 15, 2000, Plaintiff Phillip Edward Bell (Bell) brought this suit alleging that Defendant E. Davis International, Inc. (Davis) was infringing his copyright on two "War Bonnets" (Warbonnet I and

Warbonnet II), small works of handicraft made from safety pins, wire, beads, and feathers to resemble a Native American headdress. He also appears to allege that Davis engaged in unfair and deceptive trade practices in violation of North Carolina law. Bell's prayer for relief includes monetary damages, an order enjoining Davis from future distribution of its product, and an injunction compelling Davis to deliver to Bell all war bonnets already produced and now in Davis' possession. Davis filed a motion to dismiss the case on September 25, but this motion was ultimately withdrawn without prejudice on June 26, 2001. On November 21, 2000, the Magistrate Judge allowed Bell's attorney to withdraw from this case. Since that time, Bell has proceeded *pro se* in his prosecution of this litigation. Between February 28 and March 22, 2001, Bell filed what have been styled as amendments to his complaint, adding, *inter alia*, physical copies of Warbonnets I and II as exhibits to his complaint.

Davis answered the complaint on May 21, 2001, denying essentially all of Plaintiff's substantive allegations. Strictly speaking, this Answer was filed by Car Freshner Corporation (CFC) which asserted that it had assumed all of Davis' assets and liabilities by way of a merger (collectively CFC/Davis).[1] After Bell disputed the basis for substituting CFC for Davis, the Magistrate Judge entered an order substituting the parties and administratively dismissing Davis. Bell filed a notice of appeal of that decision to the Fourth Circuit Court of Appeals. While the appeal was pending, the portion of the Order dismissing Davis was overturned by the undersigned in an Order dated August 7, 2001, based on the lack of specificity in CFC/Davis' allegations surrounding the merger. Davis filed an Answer in compliance with that Order on August 22, 2001, and on September 6, 2001, CFC filed an amended answer to comply with the Court's ruling. By Order entered September 19, 2001, the Fourth Circuit dismissed the appeal on Bell's motion.

While the issue of which party or parties would remain named as Defendants in this lawsuit was in contention, CFC filed a third-party complaint on September 19, 2001, against Cousin Corporation of America (Cousin) asserting that Cousin would be derivatively liable for any liability CFC incurred as a result of Bell's lawsuit. Cousin manufactured the headdresses for CFC/Davis. Cousin answered the third-party complaint on September 19, 2001.[2] On November 6, 2001, CFC/Davis moved the Court to allow them to substitute counsel and CFC moved for voluntary dismissal of the third-party complaint. On November 29, 2001, the Court allowed both motions, but confusion remained regarding the status of Cousin in the litigation. Bell served discovery requests on Cousin shortly before the November 29 Order. He continued to write Cousin letters demanding answers to his interrogatories after the company was dismissed from the action. As such, Cousin sought guidance from the Court in a motion for direction filed January 14, 2002. The undersigned ordered that Cousin was under no obligation to respond to those requests, especially in light of the fact that the information Bell sought was available through CFC/Davis. In response, Bell argues in several plead-

---

1. CFC is still doing business as E. Davis Enterprises. *See* Exhibit 8, Affidavit of Richard O. Flechtner, *attached to* Defendants' Motion for Summary Judgment, filed January 4, 2002.

2. Upon the filing of Cousin's answer by the Cogburn law firm, the Magistrate Judge recused himself from further involvement with this case.

ings that Cousin must be brought back into the case and made to answer these questions. The Court construes these requests by Bell as motions for leave to amend the complaint to name Cousin as a party defendant. As will be discussed more thoroughly below, summary judgment will be granted to the Defendant in this matter. The bases for this determination are such that addition of Cousin would be futile. As a result, the motions for leave to amend the complaint will be denied. *See, Shanks v. Forsyth County Park Auth., Inc.,* 869 F.Supp. 1231, 1238 (M.D.N.C.1994).

Early in January 2002, CFC/Davis returned to the Court seeking a protective order to relieve it of the obligation to provide Bell with information regarding manufacturing, sales, and distribution of CFC/Davis' version of the headdresses. CFC/Davis asserts that this information is confidential commercial information the release of which could seriously damage its business. In light of Plaintiff's *pro se* status, CFC/Davis argues the Court would have greater difficulty in regulating and limiting his use of discovery materials. Bell responds with several filings all aimed at compelling CFC/Davis to answer questions regarding sales and marketing of the headdresses. As CFC/Davis correctly points out, a favorable ruling on its summary judgment motion makes ruling on these discovery disputes moot. All of Bell's discovery requests which remain unanswered are for information regarding sales volumes of the headdresses and, therefore, go to the issue of damages. Despite the fact that CFC/Davis has not fully complied with the Court's order of December 27, 2001, the Plaintiff has had complete discovery on the factual contentions that go to establishing liability.[3] As such, summary judgment on that issue is appropriate at this time.

## II. STANDARD OF REVIEW

■ Summary judgment is appropriate when there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed. R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiff. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). By reviewing substantive law, the Court may determine what matters constitute material facts. *Anderson, supra.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.* The Defendant as the moving party has the initial burden to show a lack of evidence to support the Plaintiff's case. *Shaw, supra* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If that showing is made, the burden then shifts to the Plaintiff who must convince the court that a triable issue does exist. *Shaw, supra.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts of the case for purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party.

---

**3.** CFC seems to be under the impression that it was ordered to give Bell sales information for the year 2000. The Order, however, clearly states that CFC/Davis "shall respond to *any reasonable interrogatory* concerning the sales records for the product at issue." Order of December 27, 2001.

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "When deciding [CFC/Davis'] summary judgment motion, the [C]ourt must also consider [Bell's] status as a *pro se* plaintiff.... Although not entitled to a more lenient application of the substantive law, the [C]ourt has some obligation to consider for [his] benefit legal theories that might be applicable" *Wall v. AT & T Techn., Inc.*, 754 F.Supp. 1084, 1089 (M.D.N.C.1990) (internal quotations and citations omitted).

### III. FINDINGS OF FACT

According to the submissions of the parties and their representatives, the headdress or war bonnet has been a part of Native American culture for centuries. Defendants' Brief in Support of Motion for Summary Judgment [Defendants' Brief], at 4, 10; Plaintiff's Response Against Summary Judgment [Plaintiff's Response], at 2–3. Likewise, handicraft using beadwork was, and continues to be, a part of Native American culture. *Id.* Crafts using safety pins, beads, wire, and similar components have been around since at least the 1970's. Defendants' Brief, at 4; Exhibit 2, Affidavit of Michael G. Cousin, *attached to* Defendants' Motion, at 1.

The story of these two different war bonnets begins in the 1950's. A lady named Hermina "Hermie" Wurtz (Wurtz) worked as a trapper in Northern Wisconsin. *See* Exhibits 1, 2, 4, Affidavits of Jann Loree Russell, Michael G. Cousin, and Rita M. Cousin, *attached to* Defendants' Motion. There she developed an affinity for making craft items with an Indian theme from the skins and feathers of the animals she trapped. *Id.* In 1970, Wurtz and her daughter, Rita Cousin, founded Enterprise Art Center. *Id;* Exhibits 3, 5, 6, 7, Affidavits of Jeffrey G. Cousin, Martin DiMura,

Deborah L. Campbell, and George E. Cousin, *attached to* Defendants' Motion. This company would later become Cousin, although it would also be known at various times as Enterprise Art, Inc., and Bead World, Inc. *Id.,* at Exhibits 2 through 7. CFC/Davis and many of the Cousin employees who submitted affidavits of behalf of CFC (many of them relatives of Wurtz) describe Cousin as follows: "Throughout its history, Cousin's business has focused on the sale of craft kits and supplies, including beads, safety pins, and patterns for making a variety of crafts and jewelry." *Id;* Defendants' Brief, at 4.

According to all the affidavits submitted by the Defendants, Wurtz began making Native American headdresses or war bonnets out of beads, safety pins, wire, and feathers similar to Bell's design in 1980. *Id.* She wore her designs as earrings and used them in other decorative ways. *Id.* Beginning in 1980, Wurtz began teaching craft classes in Clearwater, Florida, through Cousin's predecessors. *Id.* These classes included instruction on making earrings designed to resemble Native American headdresses and made from beads and safety pins. *Id.*

A newsletter from Enterprise Art called the "Enterprise Art Gazette" dated November 1980 contains a letter from a patron of Wurtz's lessons. In it the patron mentions that she took a lesson from Wurtz on how to make the headdress. She states that she had forgotten the instructions and requests a pattern for the headdress. The newsletter has a diagram and instructions for making a "Beaded Safety Pin Headdress." Exhibit B *attached to* Affidavit of Jann Loree Russell. This diagram and the instructions are strikingly similar to Bell's design.[4] Exhibit 1, *attached to* Plaintiff's Response; De-

---

4. *See,* Court Appendix Exhibits A, F, G, and H *attached hereto.*

position Exhibits 28 and 29, *attached to* Deposition of Phillip Edward Bell, *included in* Exhibit 9, *attached to* Defendants' Brief.

After Wurtz suffered a series of strokes in 1999, she gave Jann Russell a large number of boxes containing material relating to her interest in handicraft. Russell Affidavit, at 2. Russell avers that she discovered the newsletter among those boxes and that she took lessons from Wurtz that included instructions on making the headdress in 1986. *Id.*

Between May and December of 1987, a company called Ride a Wild Horse, Inc. (RAWH), purchased $4,590.42 of merchandise from Cousin, then Bead World, Inc. Michael Cousin Affidavit, at 3–4; Exhibit A *attached to* Cousin Affidavit. Bell was the majority shareholder of RAWH and ran its operations. Bell Deposition, at 52, 55. Although current Cousin records do not indicate the precise amount, the bill for these orders has not been paid in full to this date. Michael Cousin Affidavit, *supra.* At the time, it was the practice of Bead World, Inc., to place anyone who made a purchase on the company's mailing list. *Id.* As such, Bell, through RAWH, would have received copies of Bead World's pattern book and newsletter. Bell contends that he sent a copy of his pattern to Bead World when he made his order, although this contention is not supported by any evidence and is contradicted in part by his own account of events. Plaintiff's Response, at 8; Bell Deposition, at 181–83.[5]

Bell testified in his deposition that he created the "War Bonnet" between June and September of 1987. He derived the idea for his "War Bonnet" from a small, beaded, stringed item that someone brought into his trading post on the Cherokee Indian Reservation. Bell Deposition, at 15–16, 98–99. Bell further testified that he had help in designing the "War Bonnet" from several Cherokee Indians, specifically Tamara Long, although it was "primarily" his idea. *Id.*, at 19, 21, 44, 91, 96. However, in his complaint and on his application to the United States Copyright Office, Bell stated that the date of first publication of both "War Bonnet I" and "War Bonnet II" was July 1, 1986. *See* Deposition Exhibits 28, 29, *supra;* Complaint, at 2.[6]

On September 25, 1987, Bell submitted applications to the United States Copyright Office through an attorney for a copyright on both War Bonnet I and War Bonnet II. Bell Deposition, at 69; Deposition Exhibits 28 and 29. These applications were received on September 28, 1987, and Certificates of Registration issued to him in November 1987. Deposition Exhibits 28, 29, *supra.* Bell described both War Bonnets as, "A Decorative Novelty Device, Namely a Beaded Indian Head Dress." *Id.* War Bonnet I and II were given Registration Numbers VA 280 597 and VA 280 596, respectively. *Id.* Bell used his company, RAWH, to make and sell the War Bonnets and other craft items both at his trading post in Cherokee and to a company named Collegiate Licensing for college sports teams that have Native American mascots, such as the University of Illinois "Fighting Illini" or the Florida State University "Seminoles." Bell Deposition, at 36, 41, Exhibits 35B, 36B. He attempted to reach agreements with the merchandising

---

**5.** *See also,* Court Appendix Exhibit A, *attached hereto.*

**6.** In his response to the summary judgment motion, Bell attempts to explain the discrepancy on his application as an error on the part of either his attorney or the Copyright Office, or both. Likewise, he disclaims the allegation of the complaint, saying he did not read the complaint before it was filed by his attorney.

arms of both Major League Baseball and the National Football League. *Id.*, at 33, 36–42. Bell did have a specially made rubber stamp which could stamp his copyright mark directly onto the leather straps of his War Bonnets, but most of the 5,000 to 10,000 units he sold did not have the mark. *Id.*, at 171–76. More accurately, the mark indicated that the copyright was held by RAWH. *Id.* Bell explains that he did not stamp the War Bonnets with the mark because "it was hard to do." *Id.* He did place a copyright mark on the packaging of some (it is not clear how many) of the War Bonnets sold. *Id.*, at 174–77, Exhibits 34B, 35B, 36B, 37B. This mark was printed at the bottom of a lengthy passage of text extolling the virtues of the Eastern Band of the Cherokee Indians, their Reservation in Cherokee, North Carolina, RAWH, and Bell's trading post and restaurant on the Reservation. *Id.* The mark also appeared to name RAWH as the holder of the copyright. *Id.* It listed RAWH's address on the left and then stated either, "©1987" or "Copyright 1987" directly to the right of the address.[7] *Id.* In 1992, Bell and RAWH stopped selling War Bonnets. RAWH dissolved in 1993. *Id.*, at 36–37.

In 1993, Cousin began selling craft kits specifically including the materials and design for a headdress similar to the one Wurtz had been using since 1980. Exhibits 2, 4 through 8, *supra, attached to* Defendants' Brief. In January 1998, Cousin approached Davis, then a subsidiary of CFC, with an idea to combine the headdresses with an air freshener. As Car Freshner's name implies, it manufactures and distributes air fresheners for automobiles. Flechtner Affidavit, *supra.* CFC/

Davis entered into an agreement and began to work together to alter Cousin's then existing design so that it would be suitable for use as an air freshener. *Id.* This new design is manufactured by Cousin in China and sold to CFC/Davis which distributes the air freshener under the name, "Just Great® Indian Spirit Fruit War Bonnet." *Id.* The design used in the air fresheners is different from either Wurtz's pattern or the War Bonnet I or II. Most significantly, the headdress with the air freshener has two different pieces. It has a "crown" section that, were the headdress life sized, would fit around a wearer's head. CFC's war bonnet also has a "nape" section that would flow down the back of the wearer's neck. These two different sections are made out of safety pins and beads of different sizes. Furthermore, the entirety of the "Just Great® Indian Spirit Fruit War Bonnet" uses beads of a different size and color from Bell's design.[8] Exhibits 2, 6, *supra, attached to* Defendants' Brief; *see also,* Exhibits *attached to* Complaint and Answer.

CFC went through a corporate restructuring in 1999. As a part of that restructuring Davis merged completely into its parent company CFC, although CFC continues to do business as "E. Davis Industries." Flechtner Affidavit, *supra.* Neither CFC nor Davis claims any copyright in the various headdress designs, although Davis (now CFC) does claim a copyright on two different designs for the packages. *Id.* As such, it marks its packages, "©1998 by E Davis International" or "©1998, 1999 by E Davis." *Id.* People involved with the design of the "Just Great® Indian Spirit Fruit War Bonnet" for Cousin and CFC/

---

**7.** *See* Court Appendix Exhibits B, C, D, and E *attached hereto.*

**8.** The design of CFC/Davis' product also includes the addition of a piece of scented paper, shaped and printed to look like an arrowhead, and attached to the headdress by a string. *See* Court Appendix Exhibit I *attached hereto.*

Davis aver that no one at either company involved with that product was aware of the existence of Bell's War Bonnet I or II until after this litigation began. Exhibits 2 through 8, *supra, attached to* Defendants' Brief.

## IV. DISCUSSION

■ In order to prove copyright infringement, Bell must show that he holds a valid copyright on the work and that CFC has copied some protected element of his work. 17 U.S.C. §§ 101, *et seq.; Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Bouchat v. Baltimore Ravens, Inc.,* 241 F.3d 350, 353 (4th Cir.), *cert. denied,* 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001); *Towler v. Sayles,* 76 F.3d 579, 581 (4th Cir.1996). CFC/Davis argues that there are no issues of material fact in dispute and that it is entitled to judgment as a matter of law as to both prongs of this test. Bell did not hold a valid copyright in his design for two reasons. First, he was not the author of an original work; rather, the pattern for making Native American headdresses out of beads, wire, safety pins, and feathers existed in the public domain for several years prior to his claimed authorship. Second, Bell failed to comply with the formalities of copyright law both in his application and in protecting his claimed copyright after he was issued the Certificates. Furthermore, CFC/Davis argues that neither it nor Cousin copied Bell's design when they created the "Just Great® Indian Spirit Fruit War Bonnet." The two companies based their design on a pattern developed by Wurtz. Furthermore, CFC/Davis argues that Bell's claim for unfair and deceptive trade practices is pre-empt-

ed by the Copyright Act. Finally CFC/Davis points out that Davis cannot remain a party to this lawsuit as it does not exist as a legal entity.

In response, Bell argues that Wurtz's actions did not put her headdresses in the public domain. He states, "Cousin Corporations' purported warbonnet never existed in the 'Public Domain.'" If Mrs. Wurtz, the beartrapper, made thousands of warbonnets where did she sell them to be considered in the 'Public Domain?' Plaintiff's Response, at 7. Bell defines public domain as "a very large area where a product is being sold to the public." *Id.* Bell claims exclusive authorship of the War Bonnet in his brief.[9] *Id.* As for the problems with the copyright application Bell responds that some of them were purely clerical in nature and claims they were not his fault. *Id.,* at 7–10. He does not respond to other errors CFC/Davis points to in the application. He states that he believed, based on the advice of an attorney, that placing the copyright mark on the package for the War Bonnet under the name of RAWH was a "reasonable alternative" to placing the mark on the War Bonnets themselves under his name. *Id.,* at 5–6. Bell points to no direct evidence to show that CFC/Davis or Cousin copied his work. He relies entirely on the similarity of the products. *Id.,* at 1–3. Bell points to no factual disputes in the record, other than those created by the inconsistencies in his own positions. For example, it is unclear what role a Cherokee woman named Tamara Long played in the creation of the War Bonnets I and II or what impact the "small beaded stringed item" had on Bell's creation. However, the Court will assume the version of those facts most favorable to Bell. Bell does not

9. Actually, Bell admits in his deposition and response that a "beaded stringed object" he received from someone at the reservation played an unspecified role in his creating the War Bonnets I and II. Bell Deposition, at 15–16, 94–99.

respond to CFC/Davis' position that Davis should be dismissed or that the unfair and deceptive trade practices claim is preempted by federal law.

## A. Bell's claims against Davis

CFC submits, through the affidavit of its president, that Davis no longer exists as an entity. Davis merged into CFC in 1999 and CFC assumed all liabilities and assets of Davis as a result of this merger. Flechtner Affidavit, *supra*. Bell filed his complaint in 2000; therefore, naming Davis as a party to this lawsuit was improper. As a result, the Court will order Plaintiff's claims against Davis be dismissed. Only CFC remains as a Defendant in this action.

## B. Bell Does not Own a Valid Copyright

Before discussing the validity of Bell's copyright and his claims that CFC's product infringes thereon, the Court must clarify exactly what Bell is claiming. Bell is not claiming to hold a copyright in the specific styles, colors, and sizes of beads used in his particular piece. In fact, it seems clear that CFC's "Just Great® Indian Spirit Fruit War Bonnet" is significantly different from Bell's design in all of those elements and others.[10] Bell argues that his Certificate of Copyright gives him the exclusive right to produce "anything made with beads and shaped like a warbonnet." Bell Deposition, at 126. In his submissions to the Court he repeatedly cites the section of his Copyright application entitled "Nature of the Work." He

believes this section describes his Copyright. It reads, "A Decorative Novelty Device Namely, a Beaded Indian Head Dress." Bell asserts that his Certificates of Copyright give him the right to exercise his rights over any item meeting this general description. This assertion is clearly in error. Courts have long held that copyright protection applies only to the "fixed" or physical embodiment of an idea, not the idea itself. 17 U.S.C. § 102(b); *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954). The concept of a novelty item made using beads to resemble a headdress is an idea, not the physical fixation of an idea.[11]

Bell does possess Certificates of Registration from the U.S. Copyright Office. Normally, such Certifications "are *prima facie* evidence of copyright ownership and validity, creating a presumption of copyright that Defendants must rebut." *Armento v. Laser Image, Inc.*, 950 F.Supp. 719, 727 n. 2 (W.D.N.C.1996), *aff'd*, 134 F.3d 362, 1998 WL 29256 (4th Cir.1998) (citing 17 U.S.C. § 410(c); *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir.1986)). "That presumption, however, merely orders the burden of proof in a copyright action—by possessing a Certificate, the Plaintiff shifts the burden of production to the Defense." *Id.* (citations omitted). Here, however, Defendants have put forth substantial evidence that Bell was not the author of an original work, which Bell has not rebutted with anything other than unsubstantiated denials.

---

**10.** Bell's best argument, although he does not make it, is that CFC's product is a "derivative work" of his design. Under the Copyright Act, the right to create derivative works is protected to the author of the original. 17 U.S.C. § 106. Were his copyrights in "War Bonnet I" and "War Bonnet II" valid and were he able to show copying, this claim for infringement might have merit.

**11.** Even if Bell could receive a copyright in "anything made out of beads and shaped like a headdress" this concept is almost certainly not original. The "small beaded stringed item" seems to meet this description. Bell Deposition, at 17, 99.

Originality is "the *sine qua non* of copyright." *Feist Publ'ns,* 499 U.S. at 345, 111 S.Ct. 1282. "To qualify for copyright protection, a work must be original to its author." *Id.* However, "in the absence of copyright ... protection, even original creations are in the public domain and may be freely copied." *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 908 (2nd Cir.1980). Here, Defendants present numerous affidavits that show Wurtz was making and wearing a design for a headdress made from safety pins, beads, wire, and feathers at least six years before the earliest date Bell alleges that he came up with War Bonnets I and II. Bell's design is strikingly similar to that of Wurtz.[12] CFC's evidence also shows that Wurtz took steps to put her design before the public. Over the course of at least six years, she held classes where she taught others how to make war bonnets according to this design. Furthermore, the design was published in a newsletter by Enterprise Arts in November 1980. This act of publication, combined with the classes she taught, put Wurtz's design upon the public domain. Any rights Wurtz or Cousin's predecessors might have had to copyright her design were forfeited when she published it without utilizing the formalities required by the Copyright Act. *Id.;* 17 U.S.C. §§ 101, *et seq.* It is true that "a work may be protected by copyright even though it is based on ... something already in the public domain if the author, through his skill and effort, has contributed a distinguishable variation from the older works." *Donald v. Zack Meyer's T.V. Sales & Serv.,* 426 F.2d 1027, 1029 (5th Cir.1970). However, a "distinguishable variation" must be substantial and not merely trivial. *Id.,* at 1030; *see also, Nor-*

*ma Ribbon & Trimming, Inc. v. Little,* 51 F.3d 45, 46 (5th Cir.1995). No "distinguishable variation" can be found between Wurtz's design and Bell's design. Therefore, Bell never had a valid copyright in his design of War Bonnet I and War Bonnet II.

Even if Bell's Certificates of Registration did offer him initial protection for a valid copyright, Bell allowed his design to fall into the public domain, losing his copyright protection, when he failed to comply with the formalities of copyright law. CFC argues that Bell made numerous intentional misrepresentations to the Copyright Office in his application. Because of these misrepresentations, Bell's registration should be held invalid. CFC cites a number of cases to support the proposition. *Eckes v. Card Prices Update,* 736 F.2d 859, 861–62 (2nd Cir.1984); *Ronald Mayotte & Assoc. v. MGC Bldg. Co.,* 885 F.Supp. 148 (E.D.Mich.1994). CFC and Davis point to three specific facts not disputed by Bell now which were incorrectly stated in the applications. First, Bell failed to report the derivative nature of his design. It was derived generally from Native American culture and craft work, and specifically from the "small beaded stringed item." Second, Bell failed to report the involvement of Tamara Long (and possibly other Cherokees) in his design of War Bonnets I and II. Instead, he reported that he was the sole author of the work in his application. Third, Bell stated that the War Bonnets were originally published in 1986; he now contends they were not invented until 1987. Bell responds that these errors were not intentional. He contends that he filled out the application according to his attorney's instructions.

---

**12.** The Court is well aware of the import of the phrase, "strikingly similar." Had Wurtz or Cousin applied for and received copyright protection on her design and brought suit against Bell, the Court would be willing to utilize the inference of access discussed in *Bouchat v. Baltimore Ravens Inc.,* 241 F.3d 350, 355 (4th Cir.2001).

He also argues that some of the errors were made by the Copyright Office.

The Court cannot find that there is undisputed evidence that Bell's representations were intentional. Clearly, there were errors in Bell's application. A factual dispute remains, however, whether Bell knew of these errors or knew the importance of his assertions. Especially in light of his *pro se* status, summary judgment is inappropriate on this point. It is possible that Bell's errors in his application were inadvertent. Such errors are not sufficient grounds to invalidate a copyright. *Bouchat v. Baltimore Ravens*, 241 F.3d 350, 356 (4th Cir.2001); *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 689 (4th Cir.1992).

Regardless, there is no factual dispute that Bell failed to comply with the requirements of § 401 of the Copyright Act. That section requires that a notice of copyright be affixed to all copies of a work distributed by, or with the permission of, the author.[13] 17 U.S.C. §§ 401–405; *Charles Garnier, Paris v. Andin Int'l Inc.*, 36 F.3d 1214 (1st Cir.1994). The notice consists of either the mark "©," the word "Copyright," or the abbreviation "Copr." 17 U.S.C. § 401(b). The notice must also list the name of the copyright holder and the date of first publication. *Id.* Where the copyrighted work is a sculptural work, as it is here, the notice should be provided in one of two ways. 17 U.S.C. § 401(c); 37 C.F.R. § 201.20(i)(2–3). If practicable,

> a notice affixed directly or by means of a label cemented, sewn, or otherwise at-

tached durably, so as to withstand normal use, to any visible portion of the work, or to any base, mounting, framing, or other material on which the copies are durably attached, so as to withstand normal use, or in which they are permanently housed, is acceptable.

37 C.F.R. § 201.20(i)(2). If this is not possible because of "the size or physical characteristics of the material in which the work is reproduced in copies" then the notice may be affixed to tag which is attached to the copy such that both the tag and the method of attachment are "sufficiently durable" to "withstand normal use" and "remain with the copy while it is passing through its normal channels of commerce" *Id.*, at § 201.20(i)(3). Where that is not possible, the notice must come as close to these requirements as reasonable possible. *Id.* While these regulations are not exhaustive, they do provide the general precept that a notice must be durably attached to the actual physical copy of the work so as to remain attached through normal use and to make it clear to the consumer that the copyright holder is claiming a copyright in the work as opposed to the packaging. 17 U.S.C. § 401(c). It is undisputed that very few of the 5,000 to 10,000 copies of the war bonnet which Bell distributed to the public through RAWH had any mark that would meet these requirements.[14] It is also undisputed that Bell had the ability to affix his notice directly onto his work.

■ The Copyright Act provides for certain exceptions to the rule that a copy-

---

13. These notice requirements have been changed subject to the Berne Convention and the Act implementing it in 1988; however, the notice requirements of the 1976 Copyright Act apply to Bell's design. *See, Charles Garnier, Paris v. Andin Int'l Inc.*, 36 F.3d 1214, 1225 (1st Cir.1994).

14. Bell did affix a notice of copyright to the box in which his war bonnet was sold. However, the Court finds that this notice was insufficient to adequately protect Bell's claim. Not only was it not affixed to the actual product in a durable manner, but this notice also failed to indicate that it was intended to apply to the war bonnet inside the box as opposed to the design of the box itself.

right holder who fails to put his mark on copies he distributes loses his copyright. 17 U.S.C. § 405(a). Section 405 provides that "the omission of the copyright notice described in sections 401 through 403 from copies ... publicly distributed by authority of the copyright owner does not invalidate the copyright in a work" in three different circumstances. *Id.* The third of these deals with written agreements between the copyright holder and a licensed distributer of the work and is inapplicable here. *Id.*, at § 405(a)(3). The first exception states that the failure to place the copyright notice on copies of a work will not defeat the holder's right where "the notice has been omitted from no more than a relatively small number of copies ... distributed to the public." § 405(a)(1). Here, Bell admits that the vast majority of the 5,000 to 10,000 copies of his war bonnet were distributed without the notice. Bell is left with the "cure provisions" of § 405(a)(2).

■ That section provides that a copyright holder who has registered his copyright and distributes copies without the required notice will not lose his right if "a reasonable effort is made to add notice to all copies ... that are distributed to the public in the United States after the omission has been discovered." 17 U.S.C. § 405(a)(2). Where the omission of copyright notice is the result of deliberate action rather than inadvertence or negligence, the issue of when such an omission is "discovered" is a complex one. *See, e.g. Charles Garnier, supra; Beacon Looms, Inc. v. S. Lichtenberg & Co. Inc.*, 552 F.Supp. 1305 (S.D.N.Y.1982), *overruled on other grounds by, Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189 (2nd Cir. 1985); *O'Neill Dev., Inc. v. Galen Kilburn, Inc.*, 524 F.Supp. 710 (N.D.Ga.1981); *Flag Fables, Inc. v. Jean Ann's Country Flags*

*& Crafts, Inc.*, 730 F.Supp. 1165 (D.Mass. 1989). The law is clear, however that.

> When an author makes a deliberate decision to forgo potential copyright protection of a work by failing to affix notice on copies, *with the knowledge that copyright notice is normally required,* that author becomes aware of the legal effect of its omission of notice and thus has discovered the omission for purposes of § 405(a)(2).

*Charles Garnier,* 36 F.3d at 1222 (emphasis added). This is the case here. *See* Bell Deposition, at 171–73. As such, the Court holds that Bell "discovered" the omission of the copyright notice as soon as he began to distribute copies without the notice. Since he made no effort to affix a copyright notice to essentially all of the copies he distributed, Bell cannot receive the protection of § 404(a)(2)'s "cure provision." As such Bell failed to adequately protect any copyright he might have had in his design.

## C. CFC did not copy any elements of Bell's design

■ Even if Bell did hold a valid copyright in his designs, he could not prevail on his claim of infringement. In addition to proving that he holds a valid copyright, Bell must prove that CFC copied protected elements of his work. *Bouchat,* 241 F.3d at 353 (citing *Sayles,* 76 F.3d at 581; *Feist Publ'ns,* 499 U.S. at 361, 111 S.Ct. 1282). "Where direct evidence of copying is lacking, [Bell] may prove copying by circumstantial evidence in the form of proof that [CFC] had access to the work and that the supposed copy is substantially similar to the author's original work." *Id.,* at 353–54. In order to prove access, "[Bell] must show that [someone at CFC or Cousin] had an opportunity to view or to copy [his] work." *Sayles,* 76 F.3d at 582. "A mere possibility that such an opportunity could have arisen will not suf-

fice. Rather, it must be reasonably possible that the paths of the infringer and the infringed work crossed." *Id.* (citing *Moore v. Columbia Pictures Indus., Inc.,* 972 F.2d 939, 942 (8th Cir.1992)).

Employees of Cousin and CFC involved in the design of the "Just Great® Indian Spirit Fruit War Bonnet" aver that no one in either company ever saw Bell's design. Bell does not have any direct evidence to contradict this assertion. He must rely on a theory of access and substantial similarity. Bell does not have any direct evidence that any CFC or Cousin employees had access to his work. Were his work one which had been viewed by few people, his case would clearly fail. However, as many as 10,000 copies of Bell's design were sold at the retail level across the eastern United States. He could argue (although he does not) that this fact alone creates a fact issue as to whether a reasonable possibility existed that the alleged infringers had access to his work. In fact, there is some case law to support this proposition. *Cholvin v. B. & F. Music Co.,* 253 F.2d 102 (7th Cir.1958); *Arnstein v. Porter,* 154 F.2d 464 (2nd Cir.1946). Both of these cases, however, involved music that was played over the radio as well as distributed both as sheet music and as recorded sound in significantly greater numbers than Bell's design. *Cholvin,* 253 F.2d at 103; *Arnstein,* 154 F.2d at 469. As such, there is a much greater likelihood that the defendants in those cases had access to the plaintiff's work than could reasonably be inferred from Bell's evidence about the distribution of his work. The Court finds that the dissemination of Bell's products, standing alone, merely creates the "possibility" of access to his work. It does not create a factual issue as to whether a "reasonable probability" exists that someone at CFC or Cousin had access to Bell's product. No material issues of fact are in dispute as to the second element Bell must prove, copying.

Bell having failed his burden of production on both elements of a claim of copyright infringement, summary judgment is, therefore, granted to CFC.

**D. Bell's State Law Unfair and Deceptive Trade Practices Act claim**

 Section 301 of the Copyright Act states:

Preemption with respect to other laws

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). The Fourth Circuit has held that this section preempts state law claims "if the work is within the scope of the subject matter of copyright as specified in [§§ 102 and 103] and the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in [§ 106]". *Rosciszewski v. Arete Assoc. Inc.,* 1 F.3d 225, 229 (4th Cir.1993) (internal quotations and citations omitted).

 Section 106 of the Copyright Act " 'affords a copyright owner the exclusive right to: (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work by sale or otherwise; and, with respect to certain artistic works, (4) perform the work publicly; and (5) display the work publicly.' "

*Id.* (citing *Computer Assocs. Intl. v. Altai, Inc.*, 982 F.2d 693, 716 (2nd Cir.1992)); 17 U.S.C. § 106. "State-law claims that infringe one of the exclusive rights contained in § 106 are preempted by § 301(a) if the right defined by state law may be abridged by an act which, in and of itself, would infringe one of the exclusive rights." *Rosciszewski*, 1 F.3d at 229 (citations omitted). "However, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, ... there is no preemption, provided that the extra element changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim." *Id.*, at 229–30 (internal quotations and citations omitted). "To prevail on a claim of unfair and deceptive trade practices, a plaintiff must show: (1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff was injured thereby." *First Atlantic Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C.App. 242, 252, 507 S.E.2d 56, 63 (1998) (citing *Canady v. Mann*, 107 N.C.App. 252, 260, 419 S.E.2d 597, 602 (1992); N.C.Gen.Stat. § 75–1.1 (1994)). "The plaintiff must also establish [he] 'suffered actual injury as a proximate result of defendant's misrepresentations' or unfair conduct". *Id.* (citing *Ellis v. Smith–Broadhurst, Inc.*, 48 N.C.App. 180, 184, 268 S.E.2d 271, 273–74 (1980); N.C.Gen.Stat. § 75–16 (1994)).

In his Complaint, Bell asserts that "Defendant has been manufacturing, selling, and otherwise been marketing the decorative novelty device known as Warbonnet." Complaint at 2–3. According to Bell, these facts constitute "unfair trade practices and unfair competition." *Id.*, at 3. Insofar as the allegations of this paragraph assert a claim for unfair and deceptive trade practices in violation of N.C.Gen.Stat. §§ 75–1.1 and 16, they do not allege that CFC has violated any right other than the exclusive rights guaranteed under Section 106 of the Copyright Act. Bell is not required to prove any "extra element" under the North Carolina law. As such, this claim is preempted under § 301(a).

## V. ORDER

IT IS, THEREFORE, ORDERED that the Plaintiff's claims against E. Davis International, Inc., are hereby **DISMISSED.**

IT IS FURTHER ORDERED that Plaintiff's claim for unfair and deceptive trade practices is hereby **DISMISSED.**

IT IS FURTHER ORDERED that Defendants' motion for summary judgment is hereby **GRANTED.**

IT IS FURTHER ORDERED that Plaintiff's motion to compel, motions to continue, motion for a jury trial, motion for reconsideration of the Court's order of January 17, 2002, motion for the withdrawal of the Cogburn law firm from this action, and Defendants' motion for a protective order are hereby **DENIED** as moot.

IT IS FURTHER ORDERED that Plaintiff's filings with the Court, construed as containing motions to amend the complaint to add Cousin Corporation of America, Inc., are hereby **DENIED** as moot.

Because the Court is dismissing Plaintiff's action in its entirety by way of Judgment filed herewith, the pretrial conference scheduled for Monday, February 25, 2002, is cancelled.